# UNITED STATES *v.* WADE.

No. 334.   Argued February 16, 1967.—Decided June 12, 1967.

*Beatrice Rosenberg* argued the cause for the United States. With her on the brief were *Acting Solicitor General Spritzer, Assistant Attorney General Vinson, Nathan Lewin* and *Ronald L. Gainer.*

*Weldon Holcomb* argued the cause and filed a brief for respondent.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question here is whether courtroom identifications of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trial at a post-indictment lineup conducted for

identification purposes without notice to and in the absence of the accused's appointed counsel.

The federally insured bank in Eustace, Texas, was robbed on September 21, 1964. A man with a small strip of tape on each side of his face entered the bank, pointed a pistol at the female cashier and the vice president, the only persons in the bank at the time, and forced them to fill a pillowcase with the bank's money. The man then drove away with an accomplice who had been waiting in a stolen car outside the bank. On March 23, 1965, an indictment was returned against respondent, Wade, and two others for conspiring to rob the bank, and against Wade and the accomplice for the robbery itself. Wade was arrested on April 2, and counsel was appointed to represent him on April 26. Fifteen days later an FBI agent, without notice to Wade's lawyer, arranged to have the two bank employees observe a lineup made up of Wade and five or six other prisoners and conducted in a courtroom of the local county courthouse. Each person in the line wore strips of tape such as allegedly worn by the robber and upon direction each said something like "put the money in the bag," the words allegedly uttered by the robber. Both bank employees identified Wade in the lineup as the bank robber.

At trial, the two employees, when asked on direct examination if the robber was in the courtroom, pointed to Wade. The prior lineup identification was then elicited from both employees on cross-examination. At the close of testimony, Wade's counsel moved for a judgment of acquittal or, alternatively, to strike the bank officials' courtroom identifications on the ground that conduct of the lineup, without notice to and in the absence of his appointed counsel, violated his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to the assistance of counsel. The motion was denied, and Wade was convicted. The

Court of Appeals for the Fifth Circuit reversed the conviction and ordered a new trial at which the in-court identification evidence was to be excluded, holding that, though the lineup did not violate Wade's Fifth Amendment rights, "the lineup, held as it was, in the absence of counsel, already chosen to represent appellant, was a violation of his Sixth Amendment rights . . . ." 358 F. 2d 557, 560. We granted certiorari, 385 U. S. 811, and set the case for oral argument with No. 223, *Gilbert* v. *California, post,* p. 263, and No. 254, *Stovall* v. *Denno, post,* p. 293, which present similar questions. We reverse the judgment of the Court of Appeals and remand to that court with direction to enter a new judgment vacating the conviction and remanding the case to the District Court for further proceedings consistent with this opinion.

## I.

Neither the lineup itself nor anything shown by this record that Wade was required to do in the lineup violated his privilege against self-incrimination. We have only recently reaffirmed that the privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature . . . ." *Schmerber* v. *California,* 384 U. S. 757, 761. We there held that compelling a suspect to submit to a withdrawal of a sample of his blood for analysis for alcohol content and the admission in evidence of the analysis report were not compulsion to those ends. That holding was supported by the opinion in *Holt* v. *United States,* 218 U. S. 245, in which case a question arose as to whether a blouse belonged to the defendant. A witness testified at trial that the defendant put on the blouse and it had fit him. The defendant argued that the admission of the testimony was error because compelling him to put on the blouse was a violation of his privilege. The Court

rejected the claim as "an extravagant extension of the Fifth Amendment," Mr. Justice Holmes saying for the Court:

"[T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." 218 U. S., at 252–253.

The Court in *Holt*, however, put aside any constitutional questions which might be involved in compelling an accused, as here, to exhibit himself before victims of or witnesses to an alleged crime; the Court stated, "we need not consider how far a court would go in compelling a man to exhibit himself." *Id.*, at 253.[1]

We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have. It is no different from compelling Schmerber to provide a blood sample or Holt to wear the blouse, and, as in those instances, is not within the cover of the privilege. Similarly, compelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a "testimonial" nature; he was required to use his voice as an identifying

---

[1] *Holt* was decided before *Weeks* v. *United States*, 232 U. S. 383, fashioned the rule excluding illegally obtained evidence in a federal prosecution. The Court therefore followed *Adams* v. *New York*, 192 U. S. 585, in holding that, in any event, "when he is exhibited, whether voluntarily or by order, and even if the order goes too far, the evidence, if material, is competent." 218 U. S., at 253.

physical characteristic, not to speak his guilt. We held in *Schmerber, supra,* at 761, that the distinction to be drawn under the Fifth Amendment privilege against self-incrimination is one between an accused's "communications" in whatever form, vocal or physical, and "compulsion which makes a suspect or accused the source of 'real or physical evidence,'" *Schmerber, supra,* at 764. We recognized that "both federal and state courts have usually held that . . . [the privilege] offers no protection against compulsion to submit to fingerprinting, photography, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Id.,* at 764. None of these activities becomes testimonial within the scope of the privilege because required of the accused in a pretrial lineup.

Moreover, it deserves emphasis that this case presents no question of the admissibility in evidence of anything Wade said or did at the lineup which implicates his privilege. The Government offered no such evidence as part of its case, and what came out about the lineup proceedings on Wade's cross-examination of the bank employees involved no violation of Wade's privilege.

## II.

The fact that the lineup involved no violation of Wade's privilege against self-incrimination does not, however, dispose of his contention that the courtroom identifications should have been excluded because the lineup was conducted without notice to and in the absence of his counsel. Our rejection of the right to counsel claim in *Schmerber* rested on our conclusion in that case that "[n]o issue of counsel's ability to assist petitioner in respect of any rights he did possess is presented." 384 U. S., at 766. In contrast, in this case it is urged that the assistance of counsel at the lineup was indispensable

to protect Wade's most basic right as a criminal defendant—his right to a fair trial at which the witnesses against him might be meaningfully cross-examined.

The Framers of the Bill of Rights envisaged a broader role for counsel than under the practice then prevailing in England of merely advising his client in "matters of law," and eschewing any responsibility for "matters of fact." [2] The constitutions in at least 11 of the 13 States expressly or impliedly abolished this distinction. *Powell* v. *Alabama,* 287 U. S. 45, 60–65; Note, 73 Yale L. J. 1000, 1030–1033 (1964). "Though the colonial provisions about counsel were in accord on few things, they agreed on the necessity of abolishing the facts-law distinction; the colonists appreciated that if a defendant were forced to stand alone against the state, his case was foredoomed." 73 Yale L. J., *supra,* at 1033–1034. This background is reflected in the scope given by our decisions to the Sixth Amendment's guarantee to an accused of the assistance of counsel for his defense. When the Bill of Rights was adopted, there were no organized police forces as we know them today.[3] The accused confronted the prosecutor and the witnesses against him, and the evidence was marshalled, largely at the trial itself. In contrast, today's law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality. In recognition of these realities of modern criminal prosecution, our cases have construed the Sixth Amendment guarantee to apply to "critical" stages of the proceedings. The guarantee reads: "In all criminal

---

[2] See *Powell* v. *Alabama,* 287 U. S. 45, 60–65; Beaney, Right to Counsel in American Courts 8–26.

[3] See Note, 73 Yale L. J. 1000, 1040–1042 (1964); Comment, 53 Calif. L. Rev. 337, 347–348 (1965).

prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel *for his defence.*" (Emphasis supplied.) The plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful "defence."

As early as *Powell* v. *Alabama, supra,* we recognized that the period from arraignment to trial was "perhaps the most critical period of the proceedings . . . ," *id.,* at 57, during which the accused "requires the guiding hand of counsel . . . ," *id.,* at 69, if the guarantee is not to prove an empty right. That principle has since been applied to require the assistance of counsel at the type of arraignment—for example, that provided by Alabama—where certain rights might be sacrificed or lost: "What happens there may affect the whole trial. Available defenses may be irretrievably lost, if not then and there asserted . . . ." *Hamilton* v. *Alabama,* 368 U. S. 52, 54. See *White* v. *Maryland,* 373 U. S. 59. The principle was also applied in *Massiah* v. *United States,* 377 U. S. 201, where we held that incriminating statements of the defendant should have been excluded from evidence when it appeared that they were overheard by federal agents who, without notice to the defendant's lawyer, arranged a meeting between the defendant and an accomplice turned informant. We said, quoting a concurring opinion in *Spano* v. *New York,* 360 U. S. 315, 326, that "[a]nything less . . . might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.'" 377 U. S., at 204.

In *Escobedo* v. *Illinois,* 378 U. S. 478, we drew upon the rationale of *Hamilton* and *Massiah* in holding that the right to counsel was guaranteed at the point where the accused, prior to arraignment, was subjected to secret interrogation despite repeated requests to see his lawyer. We again noted the necessity of counsel's pres-

ence if the accused was to have a fair opportunity to present a defense at the trial itself:

> "The rule sought by the State here, however, would make the trial no more than an appeal from the interrogation; and the 'right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination' . . . . 'One can imagine a cynical prosecutor saying: "Let them have the most illustrious counsel, now. They can't escape the noose. There is nothing that counsel can do for them at the trial." ' " 378 U. S., at 487–488.

Finally in *Miranda* v. *Arizona,* 384 U. S. 436, the rules established for custodial interrogation included the right to the presence of counsel. The result was rested on our finding that this and the other rules were necessary to safeguard the privilege against self-incrimination from being jeopardized by such interrogation.

Of course, nothing decided or said in the opinions in the cited cases links the right to counsel only to protection of Fifth Amendment rights. Rather those decisions "no more than reflect a constitutional principle established as long ago as *Powell* v. *Alabama* . . . ." *Massiah* v. *United States, supra,* at 205. It is central to that principle that in addition to counsel's presence at trial,[4] the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.[5] The security of that right is as much the aim of the right to counsel as it is of the other guarantees of the

---

[4] See, *e. g., Powell* v. *Alabama,* 287 U. S. 45; *Hamilton* v. *Alabama,* 368 U. S. 52; *White* v. *Maryland,* 373 U. S. 59; *Escobedo* v. *Illinois,* 378 U. S. 478; *Massiah* v. *United States,* 377 U. S. 201.

[5] See cases cited n. 4, *supra; Avery* v. *Alabama,* 308 U. S. 444, 446.

Sixth Amendment—the right of the accused to a speedy and public trial by an impartial jury, his right to be informed of the nature and cause of the accusation, and his right to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor. The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution. Cf. *Pointer* v. *Texas*, 380 U. S. 400.

In sum, the principle of *Powell* v. *Alabama* and succeeding cases requires that we scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.

## III.

The Government characterizes the lineup as a mere preparatory step in the gathering of the prosecution's evidence, not different—for Sixth Amendment purposes—from various other preparatory steps, such as systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like. We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at

trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial.

## IV.

But the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.[6]  Mr. Justice Frankfurter once said: "What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure." The Case of Sacco and Vanzetti 30 (1927). A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. A commenta-

---

[6] Borchard, Convicting the Innocent; Frank & Frank, Not Guilty; Wall, Eye-Witness Identification in Criminal Cases; 3 Wigmore, Evidence § 786a (3d ed. 1940); Rolph, Personal Identity; Gross, Criminal Investigation 47–54 (Jackson ed. 1962); Williams, Proof of Guilt 83–98 (1955); Wills, Circumstantial Evidence 192–205 (7th ed. 1937); Wigmore, The Science of Judicial Proof §§ 250–253 (3d ed. 1937).

tor has observed that "[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined." Wall, Eye-Witness Identification in Criminal Cases 26. Suggestion can be created intentionally or unintentionally in many subtle ways.[7] And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest.

Moreover, "[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial."[8]

The pretrial confrontation for purpose of identification may take the form of a lineup, also known as an "identification parade" or "showup," as in the present case, or presentation of the suspect alone to the witness, as in *Stovall* v. *Denno, supra.* It is obvious that risks of suggestion attend either form of confrontation and increase the dangers inhering in eyewitness identification.[9] But

---

[7] See Wall, *supra,* n. 6, at 26–65; Murray, The Criminal Lineup at Home and Abroad, 1966 Utah L. Rev. 610; Napley, Problems of Effecting the Presentation of the Case for a Defendant, 66 Col. L. Rev. 94, 98–99 (1966); Williams, Identification Parades, [1955] Crim. L. Rev. (Eng.) 525; Paul, Identification of Accused Persons, 12 Austl. L. J. 42 (1938); Houts, From Evidence to Proof 25; Williams & Hammelmann, Identification Parades, Parts I & II, [1963] Crim. L. Rev. 479–490, 545–555; Gorphe, Showing Prisoners to Witnesses for Identification, 1 Am. J. Police Sci. 79 (1930); Wigmore, The Science of Judicial Proof, *supra,* n. 6, at § 253; Devlin, The Criminal Prosecution in England 70; Williams, Proof of Guilt 95–97.

[8] Williams & Hammelmann, Identification Parades, Part I, [1963] Crim. L. Rev. 479, 482.

[9] Williams & Hammelmann, Identification Parades, Part I, *supra,* n. 7.

as is the case with secret interrogations, there is serious difficulty in depicting what transpires at lineups and other forms of identification confrontations. "Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on . . . ." *Miranda* v. *Arizona, supra,* at 448. For the same reasons, the defense can seldom reconstruct the manner and mode of lineup identification for judge or jury at trial. Those participating in a lineup with the accused may often be police officers;[10] in any event, the participants' names are rarely recorded or divulged at trial.[11] The impediments to an objective observation are increased when the victim is the witness. Lineups are prevalent in rape and robbery prosecutions and present a particular hazard that a victim's understandable outrage may excite vengeful or spiteful motives.[12] In any event, neither witnesses nor lineup participants are apt to be alert for conditions prejudicial to the suspect. And if they were, it would likely be of scant benefit to the suspect since neither witnesses nor lineup participants are likely to be schooled in the detection of suggestive influences.[13] Improper in-

---

[10] See Wall, *supra*, n. 6, at 57–59; see, *e. g., People* v. *Boney,* 28 Ill. 2d 505, 192 N. E. 2d 920 (1963); *People* v. *James,* 218 Cal. App. 2d 166, 32 Cal. Rptr. 283 (1963).

[11] See Rolph, Personal Identity 50: "The bright burden of identity, at these parades, is lifted from the innocent participants to hover about the suspect, leaving the rest featureless and unknown and without interest."

[12] See Williams & Hammelmann, Identification Parades, Part II, [1963] Crim. L. Rev. 545, 546; Borchard, Convicting the Innocent 367.

[13] An additional impediment to the detection of such influences by participants, including the suspect, is the physical conditions often surrounding the conduct of the lineup. In many, lights shine on the stage in such a way that the suspect cannot see the witness. See *Gilbert* v. *United States,* 366 F. 2d 923 (C. A. 9th Cir. 1966). In some a one-way mirror is used and what is said on the witness'

fluences may go undetected by a suspect, guilty or not, who experiences the emotional tension which we might expect in one being confronted with potential accusers.[14] Even when he does observe abuse, if he has a criminal record he may be reluctant to take the stand and open up the admission of prior convictions. Moreover, any protestations by the suspect of the fairness of the lineup made at trial are likely to be in vain;[15] the jury's choice is between the accused's unsupported version and that of the police officers present.[16] In short, the accused's

---

side cannot be heard. See *Rigney* v. *Hendrick*, 355 F. 2d 710, 711, n. 2 (C. A. 3d Cir. 1965); *Aaron* v. *State*, 273 Ala. 337, 139 So. 2d 309 (1961).

[14] Williams & Hammelmann, Part I, *supra*, n. 7, at 489; Napley, *supra*, n. 7, at 99.

[15] See *In re Groban*, 352 U. S. 330, 340 (BLACK, J., dissenting). The difficult position of defendants in attempting to protest the manner of pretrial identification is illustrated by the many state court cases in which contentions of blatant abuse rested on their unsupportable allegations, usually controverted by the police officers present. See, *e. g., People* v. *Shields*, 70 Cal. App. 2d 628, 634–635, 161 P. 2d 475, 478–479 (1945); *People* v. *Hicks*, 22 Ill. 2d 364, 176 N. E. 2d 810 (1961); *State* v. *Hill*, 193 Kan. 512, 394 P. 2d 106 (1964); *Redmon* v. *Commonwealth*, 321 S. W. 2d 397 (Ky. Ct. App. 1959); *Lubinski* v. *State*, 180 Md. 1, 8, 22 A. 2d 455, 459 (1941). For a striking case in which hardly anyone agreed upon what occurred at the lineup, including who identified whom, see *Johnson* v. *State*, 237 Md. 283, 206 A. 2d 138 (1965).

[16] An instructive example of the defendant's predicament may be found in *Proctor* v. *State*, 223 Md. 394, 164 A. 2d 708 (1960). A prior identification is admissible in Maryland only under the salutary rule that it cannot have been made "under conditions of unfairness or unreliability." *Id.*, at 401, 164 A. 2d, at 712. Against the defendant's contention that these conditions had not been met, the Court stated:

"In the instant case, there are no such facts as, in our judgment, would call for a finding that the identification . . . was made under conditions of unfairness or unreliability. The relatively large number of persons put into the room together for [the victim] to look at

inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification.

What facts have been disclosed in specific cases about the conduct of pretrial confrontations for identification illustrate both the potential for substantial prejudice to the accused at that stage and the need for its revelation at trial. A commentator provides some striking examples:

> "In a Canadian case . . . the defendant had been picked out of a line-up of six men, of which he was the only Oriental. In other cases, a black-haired suspect was placed among a group of light-haired persons, tall suspects have been made to stand with short non-suspects, and, in a case where the perpetrator of the crime was known to be a youth, a suspect under twenty was placed in a line-up with five other persons, all of whom were forty or over." [17]

Similarly state reports, in the course of describing prior identifications admitted as evidence of guilt, reveal

---

is one circumstance indicating fairness, and the fact that the police officer was unable to remember the appearances of the others and could not recall if they had physical characteristics similar to [the defendant's] or not is at least suggestive that they were not of any one type or that they all differed markedly in looks from the defendant. There is no evidence that the Police Sergeant gave the complaining witness any indication as to which of the thirteen men was the defendant; the Sergeant's testimony is simply that he asked [the victim] if he could identify [the defendant] after having put the thirteen men in the courtroom."

[17] Wall, Eye-Witness Identification in Criminal Cases 53. For other such examples see Houts, From Evidence to Proof 25; Frankfurter, The Case of Sacco and Vanzetti 12–14, 30–32; 3 Wigmore, Evidence § 786a, at 164, n. 2 (3d ed. 1940); Paul, Identification of Accused Persons, 12 Austl. L. J. 42, 44 (1938); Rolph, Personal Identity 34–43.

numerous instances of suggestive procedures, for example, that all in the lineup but the suspect were known to the identifying witness,[18] that the other participants in a lineup were grossly dissimilar in appearance to the suspect,[19] that only the suspect was required to wear distinctive clothing which the culprit allegedly wore,[20] that the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail,[21] that the suspect is pointed out before or during a lineup,[22] and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect.[23]

The potential for improper influence is illustrated by the circumstances, insofar as they appear, surrounding the prior identifications in the three cases we decide today. In the present case, the testimony of the identi-

---

[18] See *People* v. *James,* 218 Cal. App. 2d 166, 170–171, 32 Cal. Rptr. 283, 286 (1963); *People* v. *Boney,* 28 Ill. 2d 505, 192 N. E. 2d 920 (1963).

[19] See *Fredericksen* v. *United States,* 105 U. S. App. D. C. 262, 266 F. 2d 463 (1959); *People* v. *Adell,* 75 Ill. App. 2d 385, 221 N. E. 2d 72 (1966); *State* v. *Hill,* 193 Kan. 512, 394 P. 2d 106 (1964); *People* v. *Seppi,* 221 N. Y. 62, 116 N. E. 793 (1917); *State* v. *Duggan,* 215 Ore. 151, 162, 333 P. 2d 907, 912 (1958).

[20] See *People* v. *Crenshaw,* 15 Ill. 2d 458, 460, 155 N. E. 2d 599, 602 (1959); *Presley* v. *State,* 224 Md. 550, 168 A. 2d 510 (1961); *State* v. *Ramirez,* 76 N. M. 72, 412 P. 2d 246 (1966); *State* v. *Bazemore,* 193 N. C. 336, 137 S. E. 172 (1927); *Barrett* v. *State,* 190 Tenn. 366, 229 S. W. 2d 516 (1950).

[21] See *Aaron* v. *State,* 273 Ala. 337, 139 So. 2d 309 (1961); *Bishop* v. *State,* 236 Ark. 12, 364 S. W. 2d 676 (1963); *People* v. *Thompson,* 406 Ill. 555, 94 N. E. 2d 349 (1950); *People* v. *Berne,* 384 Ill. 334, 51 N. E. 2d 578 (1943); *People* v. *Martin,* 304 Ill. 494, 136 N. E. 711 (1922); *Barrett* v. *State,* 190 Tenn. 366, 229 S. W. 2d 516 (1950).

[22] See *People* v. *Clark,* 28 Ill. 2d 423, 192 N. E. 2d 851 (1963); *Gillespie* v. *State,* 355 P. 2d 451, 454 (Okla. Cr. 1960).

[23] See *People* v. *Parham,* 60 Cal. 2d 378, 384 P. 2d 1001 (1963).

fying witnesses elicited on cross-examination revealed that those witnesses were taken to the courthouse and seated in the courtroom to await assembly of the lineup. The courtroom faced on a hallway observable to the witnesses through an open door. The cashier testified that she saw Wade "standing in the hall" within sight of an FBI agent. Five or six other prisoners later appeared in the hall. The vice president testified that he saw a person in the hall in the custody of the agent who "resembled the person that we identified as the one that had entered the bank." [24]

The lineup in *Gilbert, supra,* was conducted in an auditorium in which some 100 witnesses to several alleged state and federal robberies charged to Gilbert made wholesale identifications of Gilbert as the robber in each other's presence, a procedure said to be fraught with dangers of suggestion.[25] And the vice of suggestion created by the identification in *Stovall, supra,* was the presentation to the witness of the suspect alone handcuffed to police officers. It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police. See Frankfurter, The Case of Sacco and Vanzetti 31–32.

The few cases that have surfaced therefore reveal the existence of a process attended with hazards of serious unfairness to the criminal accused and strongly suggest the plight of the more numerous defendants who are unable to ferret out suggestive influences in the

---

[24] See Wall, *supra,* n. 6, at 48; Napley, *supra,* n. 7, at 99: "[W]hile many identification parades are conducted by the police with scrupulous regard for fairness, it is not unknown for the identifying witness to be placed in a position where he can see the suspect before the parade forms . . . ."

[25] Williams & Hammelmann, Part I, *supra,* n. 7, at 486; Burtt, Applied Psychology 254–255.

secrecy of the confrontation. We do not assume that these risks are the result of police procedures intentionally designed to prejudice an accused. Rather we assume they derive from the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification. Williams & Hammelmann, in one of the most comprehensive studies of such forms of identification, said, "[T]he fact that the police themselves have, in a given case, little or no doubt that the man put up for identification has committed the offense, and that their chief pre-occupation is with the problem of getting sufficient proof, because he has not 'come clean,' involves a danger that this persuasion may communicate itself even in a doubtful case to the witness in some way . . . ." Identification Parades, Part I, [1963] Crim. L. Rev. 479, 483.

Insofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him. *Pointer* v. *Texas,* 380 U. S. 400. And even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability. Thus in the present context, where so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself. The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no

effective appeal from the judgment there rendered by the witness—"that's the man."

Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial,[26] there can be

---

[26] One commentator proposes a model statute providing not only for counsel, but other safeguards as well:

"Most, if not all, of the attacks on the lineup process could be averted by a uniform statute modeled upon the best features of the civilian codes. Any proposed statute should provide for the right to counsel during any lineup or during any confrontation. Provision should be made that any person, whether a victim or a witness, must give a description of the suspect before he views any arrested person. A written record of this description should be required, and the witness should be made to sign it. This written record would be available for inspection by defense counsel for copying before the trial and for use at the trial in testing the accuracy of the identification made during the lineup and during the trial.

"This ideal statute would require at least six persons in addition to the accused in a lineup, and these persons would have to be of approximately the same height, weight, coloration of hair and skin, and bodily types as the suspect. In addition, all of these men should, as nearly as possible, be dressed alike. If distinctive garb was used during the crime, the suspect should not be forced to wear similar clothing in the lineup unless all of the other persons are similarly garbed. A complete written report of the names, addresses, descriptive details of the other persons in the lineup, and of everything which transpired during the identification would be mandatory. This report would include everything stated by the identifying witness during this step, including any reasons given by him as to what features, etc., have sparked his recognition.

"This statute should permit voice identification tests by having each person in the lineup repeat identical innocuous phrases, and it would be impermissible to force the use of words allegedly used during a criminal act.

"The statute would enjoin the police from suggesting to any viewer that one or more persons in the lineup had been arrested as a suspect. If more than one witness is to make an identification, each

little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was "as much entitled to such aid [of counsel] . . . as at the trial itself." *Powell* v. *Alabama*, 287 U. S. 45, 57. Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an "intelligent waiver." See *Carnley* v. *Cochran*, 369 U. S. 506. No substantial countervailing policy considerations have been advanced against the requirement of the presence of counsel. Concern is expressed that the requirement will forestall prompt identifications and result in obstruction of the confrontations. As for the first, we note that in the two cases in which the right to counsel is today held to apply, counsel had already been appointed and no argument is made in either case that notice to counsel would have prejudicially delayed the confrontations. Moreover, we leave open the question whether the presence of substitute counsel might not suffice where notification and presence of the suspect's own counsel would result in prejudicial delay.[27] And to refuse to recognize the right to counsel for fear that counsel will obstruct the course of justice is contrary to the

---

witness should be required to do so separately and should be forbidden to speak to another witness until all of them have completed the process.

"The statute could require the use of movie cameras and tape recorders to record the lineup process in those states which are financially able to afford these devices. Finally, the statute should provide that any evidence obtained as the result of a violation of this statute would be inadmissible." Murray, The Criminal Lineup at Home and Abroad, 1966 Utah L. Rev. 610, 627–628.

[27] Although the right to counsel usually means a right to the suspect's own counsel, provision for substitute counsel may be justified on the ground that the substitute counsel's presence may eliminate the hazards which render the lineup a critical stage for the presence of the suspect's *own* counsel.

basic assumptions upon which this Court has operated in Sixth Amendment cases. We rejected similar logic in *Miranda* v. *Arizona* concerning presence of counsel during custodial interrogation, 384 U. S., at 480–481:

> "[A]n attorney is merely exercising the good professional judgment he has been taught. This is not cause for considering the attorney a menace to law enforcement. He is merely carrying out what he is sworn to do under his oath—to protect to the extent of his ability the rights of his client. In fulfilling this responsibility the attorney plays a vital role in the administration of criminal justice under our Constitution."

In our view counsel can hardly impede legitimate law enforcement; on the contrary, for the reasons expressed, law enforcement may be assisted by preventing the infiltration of taint in the prosecution's identification evidence.[28] That result cannot help the guilty avoid conviction but can only help assure that the right man has been brought to justice.[29]

---

[28] Concern is also expressed that the presence of counsel will force divulgence of the identity of government witnesses whose identity the Government may want to conceal. To the extent that this is a valid or significant state interest there are police practices commonly used to effect concealment, for example, masking the face.

[29] Many other nations surround the lineup with safeguards against prejudice to the suspect. In England the suspect must be allowed the presence of his solicitor or a friend, Napley, *supra*, n. 7, at 98–99; Germany requires the presence of retained counsel; France forbids the confrontation of the suspect in the absence of his counsel; Spain, Mexico, and Italy provide detailed procedures prescribing the conditions under which confrontation must occur under the supervision of a judicial officer who sees to it that the proceedings are officially recorded to assure adequate scrutiny at trial. Murray, The Criminal Lineup at Home and Abroad, 1966 Utah L. Rev. 610, 621–627.

Legislative or other regulations, such as those of local police departments, which eliminate the risks of abuse and unintentional suggestion at lineup proceedings and the impediments to meaningful confrontation at trial may also remove the basis for regarding the stage as "critical." [30] But neither Congress nor the federal authorities have seen fit to provide a solution. What we hold today "in no way creates a constitutional strait-jacket which will handicap sound efforts at reform, nor is it intended to have this effect." *Miranda* v. *Arizona, supra,* at 467.

## V.

We come now to the question whether the denial of Wade's motion to strike the courtroom identification by the bank witnesses at trial because of the absence of his counsel at the lineup required, as the Court of Appeals held, the grant of a new trial at which such evidence is

---

[30] Thirty years ago Wigmore suggested a "scientific method" of pretrial identification "to reduce the risk of error hitherto inherent in such proceedings." Wigmore, The Science of Judicial Proof 541 (3d ed. 1937). Under this approach, at least 100 talking films would be prepared of men from various occupations, races, etc. Each would be photographed in a number of stock movements, with and without hat and coat, and would read aloud a standard passage. The suspect would be filmed in the same manner. Some 25 of the films would be shown in succession in a special projection room in which each witness would be provided an electric button which would activate a board backstage when pressed to indicate that the witness had identified a given person. Provision would be made for the degree of hesitancy in the identification to be indicated by the number of presses. *Id.,* at 540–541. Of course, the more systematic and scientific a process or proceeding, including one for purposes of identification, the less the impediment to reconstruction of the conditions bearing upon the reliability of that process or proceeding at trial. See discussion of fingerprint and like tests, Part III, *supra,* and of handwriting exemplars in *Gilbert* v. *California, supra.*

to be excluded. We do not think this disposition can be justified without first giving the Government the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification. See *Murphy* v. *Waterfront Commission,* 378 U. S. 52, 79, n. 18.[31] Where, as here, the admissibility of evidence of the lineup identification itself is not involved, a *per se* rule of exclusion of courtroom identification would be unjustified.[32] See *Nardone* v. *United States,* 308 U. S. 338, 341. A rule limited solely to the exclusion of testimony concerning identification at the lineup itself, without regard to admissibility of the courtroom identification, would render the right to counsel an empty one. The lineup is most often used, as in the present case, to crystallize the witnesses' identification of the defendant for future reference. We have already noted that the lineup identification will have that effect. The State may then rest upon the witnesses' unequivocal courtroom identification, and not mention the pretrial identification as part of the State's case at trial. Counsel is then in the predicament in which Wade's counsel found himself—realizing that possible unfairness at the lineup may be the sole means of attack upon the unequivocal courtroom identification, and having to probe in the dark

---

[31] See *Goldstein* v. *United States,* 316 U. S. 114, 124, n. 1 (Murphy, J., dissenting). "[A]fter an accused sustains the initial burden, imposed by *Nardone* v. *United States,* 308 U. S. 338, of proving to the satisfaction of the trial judge in the preliminary hearing that wire-tapping was unlawfully employed, as petitioners did here, it is only fair that the burden should then shift to the Government to convince the trial judge that its proof had an independent origin."

[32] We reach a contrary conclusion in *Gilbert* v. *California, supra,* as to the admissibility of the witness' testimony that he also identified the accused at the lineup.

in an attempt to discover and reveal unfairness, while bolstering the government witness' courtroom identification by bringing out and dwelling upon his prior identification. Since counsel's presence at the lineup would equip him to attack not only the lineup identification but the courtroom identification as well, limiting the impact of violation of the right to counsel to exclusion of evidence only of identification at the lineup itself disregards a critical element of that right.

We think it follows that the proper test to be applied in these situations is that quoted in *Wong Sun* v. *United States,* 371 U. S. 471, 488, " '[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt 221 (1959)." See also *Hoffa* v. *United States,* 385 U. S. 293, 309. Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup.[33]

---

[33] Thus it is not the case that "[i]t matters not how well the witness knows the suspect, whether the witness is the suspect's mother, brother, or long-time associate, and no matter how long or well the witness observed the perpetrator at the scene of the crime." Such factors will have an important bearing upon the true basis of

We doubt that the Court of Appeals applied the proper test for exclusion of the in-court identification of the two witnesses. The court stated that "it cannot be said with any certainty that they would have recognized appellant at the time of trial if this intervening lineup had not occurred," and that the testimony of the two witnesses "may well have been colored by the illegal procedure [and] was prejudicial." 358 F. 2d, at 560. Moreover, the court was persuaded, in part, by the "compulsory verbal responses made by Wade at the instance of the Special Agent." *Ibid.* This implies the erroneous holding that Wade's privilege against self-incrimination was violated so that the denial of counsel required exclusion.

On the record now before us we cannot make the determination whether the in-court identifications had an independent origin. This was not an issue at trial, although there is some evidence relevant to a determination. That inquiry is most properly made in the District Court. We therefore think the appropriate procedure to be followed is to vacate the conviction pending a hearing to determine whether the in-court identifications had an independent source, or whether, in any event, the introduction of the evidence was harmless error, *Chapman* v. *California,* 386 U. S. 18, and for the District Court to reinstate the conviction or order a new trial, as may be proper. See *United States* v. *Shotwell Mfg. Co.,* 355 U. S. 233, 245–246.

---

the witness' in-court identification. Moreover, the State's inability to bolster the witness' courtroom identification by introduction of the lineup identification itself, see *Gilbert* v. *California, supra,* will become less significant the more the evidence of other opportunities of the witness to observe the defendant. Thus where the witness is a "kidnap victim who has lived for days with his abductor" the value to the State of admission of the lineup identification is indeed marginal, and such identification would be a mere formality.

The judgment of the Court of Appeals is vacated and the case is remanded to that court with direction to enter a new judgment vacating the conviction and remanding the case to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE joins the opinion of the Court except for Part I, from which he dissents for the reasons expressed in the opinion of MR. JUSTICE FORTAS.

MR. JUSTICE DOUGLAS joins the opinion of the Court except for Part I. On that phase of the case he adheres to the dissenting views in *Schmerber* v. *California,* 384 U. S. 757, 772–779, since he believes that compulsory lineup violates the privilege against self-incrimination contained in the Fifth Amendment.

MR. JUSTICE CLARK, concurring.

With reference to the lineup point involved in this case I cannot, for the life of me, see why a lineup is not a critical stage of the prosecution. Identification of the suspect—a prerequisite to establishment of guilt—occurs at this stage, and with *Miranda* v. *Arizona,* 384 U. S. 436 (1966), on the books, the requirement of the presence of counsel arises, unless waived by the suspect. I dissented in *Miranda* but I am bound by it now, as we all are. *Schmerber* v. *California,* 384 U. S. 757 (1966), precludes petitioner's claim of self-incrimination. I therefore join the opinion of the Court.

MR. JUSTICE BLACK, dissenting in part and concurring in part.

On March 23, 1965, respondent Wade was indicted for robbing a bank; on April 2, he was arrested; and on April 26, the court appointed a lawyer to represent him.

Fifteen days later, while Wade was still in custody, an FBI agent took him and several other prisoners into a room at the courthouse, directed each to participate in a lineup wearing strips of tape on his face and to speak the words used by the robber at the bank. This was all done in order to let the bank employee witnesses look at Wade for identification purposes. Wade's lawyer was not notified of or present at the lineup to protect his client's interests. At Wade's trial, two bank employees identified him in the courtroom. Wade objected to this testimony, when, on cross-examination, his counsel elicited from these witnesses the fact that they had seen Wade in the lineup. He contended that by forcing him to participate in the lineup, wear strips of tape on his face, and repeat the words used by the robber, all without counsel, the Government had (1) compelled him to be a witness against himself in violation of the Fifth Amendment, and (2) deprived him of the assistance of counsel for his defense in violation of the Sixth Amendment.

The Court in Part I of its opinion rejects Wade's Fifth Amendment contention. From that I dissent. In Parts II–IV of its opinion, the Court sustains Wade's claim of denial of right to counsel in the out-of-court lineup, and in that I concur. In Part V, the Court remands the case to the District Court to consider whether the courtroom identification of Wade was the fruit of the illegal lineup, and, if it was, to grant him a new trial unless the court concludes that the courtroom identification was harmless error. I would reverse the Court of Appeals' reversal of Wade's conviction, but I would not remand for further proceedings. Since the prosecution did not use the out-of-court lineup identification against Wade at his trial, I believe the conviction should be affirmed.

## I.

In rejecting Wade's claim that his privilege against self-incrimination was violated by compelling him to appear in the lineup wearing the tape and uttering the words given him by the police, the Court relies on the recent holding in *Schmerber* v. *California,* 384 U. S. 757. In that case the Court held that taking blood from a man's body against his will in order to convict him of a crime did not compel him to be a witness against himself. I dissented from that holding, 384 U. S., at 773, and still dissent. The Court's reason for its holding was that the sample of Schmerber's blood taken in order to convict him of crime was neither "testimonial" nor "communicative" evidence. I think it was both. It seems quite plain to me that the Fifth Amendment's Self-incrimination Clause was designed to bar the Government from forcing any person to supply proof of his own crime, precisely what Schmerber was forced to do when he was forced to supply his blood. The Government simply took his blood against his will and over his counsel's protest for the purpose of convicting him of crime. So here, having Wade in its custody awaiting trial to see if he could or would be convicted of crime, the Government forced him to stand in a lineup, wear strips on his face, and speak certain words, in order to make it possible for government witnesses to identify him as a criminal. Had Wade been compelled to utter these or any other words in open court, it is plain that he would have been entitled to a new trial because of having been compelled to be a witness against himself. Being forced by the Government to help convict himself and to supply evidence against himself by talking outside the courtroom is equally violative of his constitutional right not to be compelled to be a witness against himself. Consequently, because of this violation of the Fifth Amend-

ment, and not because of my own personal view that the Government's conduct was "unfair," "prejudicial," or "improper," I would prohibit the prosecution's use of lineup identification at trial.

## II.

I agree with the Court, in large part because of the reasons it gives, that failure to notify Wade's counsel that Wade was to be put in a lineup by government officers and to be forced to talk and wear tape on his face denied Wade the right to counsel in violation of the Sixth Amendment. Once again, my reason for this conclusion is solely the Sixth Amendment's guarantee that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." As this Court's opinion points out, "[t]he plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defence.'" And I agree with the Court that a lineup is a "critical stage" of the criminal proceedings against an accused, because it is a stage at which the Government makes use of his custody to obtain crucial evidence against him. Besides counsel's presence at the lineup being necessary to protect the defendant's specific constitutional rights to confrontation and the assistance of counsel at the trial itself, the assistance of counsel at the lineup is also necessary to protect the defendant's in-custody assertion of his privilege against self-incrimination, *Miranda* v. *Arizona,* 384 U. S. 436, for, contrary to the Court, I believe that counsel may advise the defendant not to participate in the lineup or to participate only under certain conditions.

I agree with the Court that counsel's presence at the lineup is necessary to protect the accused's right to a "fair trial," only if by "fair trial" the Court means a trial in accordance with the "Law of the Land" as specifically set out in the Constitution. But there are

implications in the Court's opinion that by a "fair trial" the Court means a trial which a majority of this Court deems to be "fair" and that a lineup is a "critical stage" only because the Court, now assessing the "innumerable dangers" which inhere in it, thinks it is such. That these implications are justified is evidenced by the Court's suggestion that "[l]egislative or other regulations . . . which eliminate the risks of abuse . . . at lineup proceedings . . . may also remove the basis for regarding the stage as 'critical.'" And it is clear from the Court's opinion in *Gilbert* v. *California, post,* p. 263, that it is willing to make the Sixth Amendment's guarantee of right to counsel dependent on the Court's own view of whether a particular stage of the proceedings—though "critical" in the sense of the prosecution's gathering of evidence—is "critical" to the Court's own view of a "fair trial." I am wholly unwilling to make the specific constitutional right of counsel dependent on judges' vague and transitory notions of fairness and their equally transitory, though thought to be empirical, assessment of the "risk that . . . counsel's absence . . . might derogate from . . . [a defendant's] right to a fair trial." *Ante,* at 228. See *Pointer* v. *Texas,* 380 U. S. 400, 412 (concurring opinion of Goldberg, J.).

### III.

I would reverse Wade's conviction without further ado had the prosecution at trial made use of his lineup identification either in place of courtroom identification or to bolster in a harmful manner crucial courtroom identification. But the prosecution here did neither of these things. After prosecution witnesses under oath identified Wade in the courtroom, it was the defense, and not the prosecution, which brought out the prior lineup identification. While stating that "a *per se* rule of exclusion of courtroom identification would be unjustified," the Court, nevertheless, remands this case for "a

248

hearing to determine whether the in-court identifications had an independent source," or were the tainted fruits of the invalidly conducted lineup. From this holding I dissent.

In the first place, even if this Court has power to establish such a rule of evidence, I think the rule fashioned by the Court is unsound. The "tainted fruit" determination required by the Court involves more than considerable difficulty. I think it is practically impossible. How is a witness capable of probing the recesses of his mind to draw a sharp line between a courtroom identification due exclusively to an earlier lineup and a courtroom identification due to memory not based on the lineup? What kind of "clear and convincing evidence" can the prosecution offer to prove upon what particular events memories resulting in an in-court identification rest? How long will trials be delayed while judges turn psychologists to probe the subconscious minds of witnesses? All these questions are posed but not answered by the Court's opinion. In my view, the Fifth and Sixth. Amendments are satisfied if the prosecution is precluded from using lineup identification as either an alternative to or corroboration of courtroom identification. If the prosecution does neither and its witnesses under oath identify the defendant in the courtroom, then I can find no justification for stopping the trial in midstream to hold a lengthy "tainted fruit" hearing. The fact of and circumstances surrounding a prior lineup identification might be used by the defense to impeach the credibility of the in-court identifications, but not to exclude them completely.

But more important, there is no constitutional provision upon which I can rely that directly or by implication gives this Court power to establish what amounts to a constitutional rule of evidence to govern, not only the Federal Government, but the States in their trial of state

crimes under state laws in state courts. See *Gilbert* v. *California, supra.* The Constitution deliberately reposed in the States very broad power to create and to try crimes according to their own rules and policies. *Spencer* v. *Texas,* 385 U. S. 554. Before being deprived of this power, the least that they can ask is that we should be able to point to a federal constitutional provision that either by express language or by necessary implication grants us the power to fashion this novel rule of evidence to govern their criminal trials. Cf. *Berger* v. *New York, ante,* p. 70 (BLACK, J., dissenting). Neither *Nardone* v. *United States,* 308 U. S. 338, nor *Wong Sun* v. *United States,* 371 U. S. 471, both federal cases and both decided "in other contexts," supports what the Court demands of the States today.

Perhaps the Court presumes to write this constitutional rule of evidence on the basis of the Fourteenth Amendment's Due Process Clause. This is not the time or place to consider that claim. Suffice it for me to say briefly that I find no such authority in the Due Process Clause. It undoubtedly provides that a person must be tried in accordance with the "Law of the Land." Consequently, it violates due process to try a person in a way prohibited by the Fourth, Fifth, or Sixth Amendments of our written Constitution. But I have never been able to subscribe to the dogma that the Due Process Clause empowers this Court to declare any law, including a rule of evidence, unconstitutional which it believes is contrary to tradition, decency, fundamental justice, or any of the other wide-meaning words used by judges to claim power under the Due Process Clause. See, *e. g., Rochin* v. *California,* 342 U. S. 165. I have an abiding idea that if the Framers had wanted to let judges write the Constitution on any such day-to-day beliefs of theirs, they would have said so instead of so carefully defining their grants and prohibitions in a written constitution.

With no more authority than the Due Process Clause I am wholly unwilling to tell the state or federal courts that the United States Constitution forbids them to allow courtroom identification without the prosecution's first proving that the identification does not rest in whole or in part on an illegal lineup. Should I do so, I would feel that we are deciding what the Constitution is, not from what it says, but from what we think it would have been wise for the Framers to put in it. That to me would be "judicial activism" at its worst. I would leave the States and Federal Government free to decide their own rules of evidence. That, I believe, is their constitutional prerogative.

I would affirm Wade's conviction.

MR. JUSTICE WHITE, whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting in part and concurring in part.

The Court has again propounded a broad constitutional rule barring use of a wide spectrum of relevant and probative evidence, solely because a step in its ascertainment or discovery occurs outside the presence of defense counsel. This was the approach of the Court in *Miranda* v. *Arizona*, 384 U. S. 436. I objected then to what I thought was an uncritical and doctrinaire approach without satisfactory factual foundation. I have much the same view of the present ruling and therefore dissent from the judgment and from Parts II, IV, and V of the Court's opinion.

The Court's opinion is far-reaching. It proceeds first by creating a new *per se* rule of constitutional law: a criminal suspect cannot be subjected to a pretrial identification process in the absence of his counsel without violating the Sixth Amendment. If he is, the State may not buttress a later courtroom identification of the witness by any reference to the previous identification. Furthermore, the courtroom identification is not admis-

sible at all unless the State can establish by clear and convincing proof that the testimony is not the fruit of the earlier identification made in the absence of defendant's counsel—admittedly a heavy burden for the State and probably an impossible one. To all intents and purposes, courtroom identifications are barred if pretrial identifications have occurred without counsel being present.

The rule applies to any lineup, to any other techniques employed to produce an identification and *a fortiori* to a face-to-face encounter between the witness and the suspect alone, regardless of when the identification occurs, in time or place, and whether before or after indictment or information. It matters not how well the witness knows the suspect, whether the witness is the suspect's mother, brother, or long-time associate, and no matter how long or well the witness observed the perpetrator at the scene of the crime. The kidnap victim who has lived for days with his abductor is in the same category as the witness who has had only a fleeting glimpse of the criminal. Neither may identify the suspect without defendant's counsel being present. The same strictures apply regardless of the number of other witnesses who positively identify the defendant and regardless of the corroborative evidence showing that it was the defendant who had committed the crime.

The premise for the Court's rule is not the general unreliability of eyewitness identifications nor the difficulties inherent in observation, recall, and recognition. The Court assumes a narrower evil as the basis for its rule—improper police suggestion which contributes to erroneous identifications. The Court apparently believes that improper police procedures are so widespread that a broad prophylactic rule must be laid down, requiring the presence of counsel at all pretrial identifications, in

order to detect recurring instances of police misconduct.[1]
I do not share this pervasive distrust of all official investi-
gations. None of the materials the Court relies upon
supports it.[2] Certainly, I would bow to solid fact, but
the Court quite obviously does not have before it any
reliable, comprehensive survey of current police practices
on which to base its new rule. Until it does, the Court
should avoid excluding relevant evidence from state
criminal trials. - Cf. *Washington* v. *Texas, ante,* p. 14.

The Court goes beyond assuming that a great majority
of the country's police departments are following im-
proper practices at pretrial identifications. To find the
lineup a "critical" stage of the proceeding and to exclude
identifications made in the absence of counsel, the Court
must also assume that police "suggestion," if it occurs
at all, leads to erroneous rather than accurate identifica-
tions and that reprehensible police conduct will have
an unavoidable and largely undiscoverable impact on the
trial. This in turn assumes that there is now no adequate
source from which defense counsel can learn about the
circumstances of the pretrial identification in order to
place before the jury all of the considerations which
should enter into an appraisal of courtroom identification

---

[1] Yet in *Stovall* v. *Denno, post,* p. 293, the Court recognizes that
improper police conduct in the identification process has not been
so widespread as to justify full retroactivity for its new rule.

[2] In *Miranda* v. *Arizona,* 384 U. S. 436, 449, the Court noted that
O'Hara, Fundamentals of Criminal Investigation (1956) is a text
that has enjoyed extensive use among law enforcement agencies and
among students of police science. The quality of the work was said
to rest on the author's long service as observer, lecturer in police
science, and work as a federal crime investigator. O'Hara does not
suggest that the police should or do use identification machinery
improperly; instead he argues for techniques that would increase
the reliability of eyewitness identifications, and there is no reason
to suggest that O'Hara's views are not shared and practiced by the
majority of police departments throughout the land.

evidence. But these are treacherous and unsupported assumptions,[3] resting as they do on the notion that the defendant will not be aware, that the police and the witnesses will forget or prevaricate, that defense counsel will be unable to bring out the truth and that neither jury, judge, nor appellate court is a sufficient safeguard against unacceptable police conduct occurring at a pretrial identification procedure. I am unable to share the Court's view of the willingness of the police and the ordinary citizen-witness to dissemble, either with respect to the identification of the defendant or with respect to the circumstances surrounding a pretrial identification.

There are several striking aspects to the Court's holding. First, the rule does not bar courtroom identifications where there have been no previous identifications in the presence of the police, although when identified in the courtroom, the defendant is known to be in custody and charged with the commission of a crime. Second, the Court seems to say that if suitable legislative standards were adopted for the conduct of pretrial identifications, thereby lessening the hazards in such con-

---

[3] The instant case and its companions, *Gilbert* v. *California, post,* p. 263, and *Stovall* v. *Denno, post,* p. 293, certainly lend no support to the Court's assumptions. The police conduct deemed improper by the Court in the three cases seems to have come to light at trial in the ordinary course of events. One can ask what more counsel would have learned at the pretrial identifications that would have been relevant for truth determination at trial. When the Court premises its constitutional rule on police conduct so subtle as to defy description and subsequent disclosure it deals in pure speculation. If police conduct is intentionally veiled, the police will know about it, and I am unwilling to speculate that defense counsel at trial will be unable to reconstruct the known circumstances of the pretrial identification. And if the "unknown" influence on identifications is "innocent," the Court's general premise evaporates and the problem is simply that of the inherent shortcomings of eye-witness testimony.

frontations, it would not insist on the presence of counsel. But if this is true, why does not the Court simply fashion what it deems to be constitutionally acceptable procedures for the authorities to follow? Certainly the Court is correct in suggesting that the new rule will be wholly inapplicable where police departments themselves have established suitable safeguards.

Third, courtroom identification may be barred, absent counsel at a prior identification, regardless of the extent of counsel's information concerning the circumstances of the previous confrontation between witness and defendant—apparently even if there were recordings or sound-movies of the events as they occurred. But if the rule is premised on the defendant's right to have his counsel know, there seems little basis for not accepting other means to inform. A disinterested observer, recordings, photographs—any one of them would seem adequate to furnish the basis for a meaningful cross-examination of the eyewitness who identifies the defendant in the courtroom.

I share the Court's view that the criminal trial, at the very least, should aim at truthful factfinding, including accurate eyewitness identifications. I doubt, however, on the basis of our present information, that the tragic mistakes which have occurred in criminal trials are as much the product of improper police conduct as they are the consequence of the difficulties inherent in eyewitness testimony and in resolving evidentiary conflicts by court or jury. I doubt that the Court's new rule will obviate these difficulties, or that the situation will be measurably improved by inserting defense counsel into the investigative processes of police departments everywhere.

But, it may be asked, what possible state interest militates against requiring the presence of defense counsel at lineups? After all, the argument goes, he *may* do some good, he *may* upgrade the quality of identification evidence in state courts and he can scarcely do any

harm. Even if true, this is a feeble foundation for fastening an ironclad constitutional rule upon state criminal procedures. Absent some reliably established constitutional violation, the processes by which the States enforce their criminal laws are their own prerogative. The States *do* have an interest in conducting their own affairs, an interest which cannot be displaced simply by saying that there are no valid arguments with respect to the merits of a federal rule emanating from this Court.

Beyond this, however, requiring counsel at pretrial identifications as an invariable rule trenches on other valid state interests. One of them is its concern with the prompt and efficient enforcement of its criminal laws. Identifications frequently take place after arrest but before an indictment is returned or an information is filed. The police may have arrested a suspect on probable cause but may still have the wrong man. Both the suspect and the State have every interest in a prompt identification at that stage, the suspect in order to secure his immediate release and the State because prompt and early identification enhances *accurate* identification and because it must know whether it is on the right investigative track. Unavoidably, however, the absolute rule requiring the presence of counsel will cause significant delay and it may very well result in no pretrial identification at all. Counsel must be appointed and a time arranged convenient for him and the witnesses. Meanwhile, it may be necessary to file charges against the suspect who may then be released on bail, in the federal system very often on his own recognizance, with neither the State nor the defendant having the benefit of a properly conducted identification procedure.

Nor do I think the witnesses themselves can be ignored. They will now be required to be present at the convenience of counsel rather than their own. Many may be much less willing to participate if the identifica-

tion stage is transformed into an adversary proceeding not under the control of a judge. Others may fear for their own safety if their identity is known at an early date, especially when there is no way of knowing until the lineup occurs whether or not the police really have the right man.[4]

Finally, I think the Court's new rule is vulnerable in terms of its own unimpeachable purpose of increasing the reliability of identification testimony.

Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime.[5] To this extent, our so-called adversary system is not adversary at all; nor should it be. But defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must

---

[4] I would not have thought that the State's interest regarding its sources of identification is any less than its interest in protecting informants, especially those who may aid in identification but who will not be used as witnesses. See *McCray* v. *Illinois*, 386 U. S. 300.

[5] "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *United States*, 295 U. S. 78, 88. See also *Mooney* v. *Holohan*, 294 U. S. 103; *Pyle* v. *Kansas*, 317 U. S. 213; *Alcorta* v. *Texas*, 355 U. S. 28; *Napue* v. *Illinois*, 360 U. S. 264; *Brady* v. *Maryland*, 373 U. S. 83; *Giles* v. *Maryland*, 386 U. S. 66; *Miller* v. *Pate*, 386 U. S. 1.

be and is interested in preventing the conviction of the innocent, but, absent a voluntary plea of guilty, we also insist that he defend his client whether he is innocent or guilty. The State has the obligation to present the evidence. Defense counsel need present nothing, even if he knows what the truth is. He need not furnish any witnesses to the police, or reveal any confidences of his client, or furnish any other information to help the prosecution's case. If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive, that will be his normal course.[6] Our interest in not con-

---

[6] One point of view about the role of the courtroom lawyer appears in Frank, Courts on Trial 82–83. "What is the role of the lawyers in bringing the evidence before the trial court? As you may learn by reading any one of a dozen or more handbooks on how to try a law-suit, an experienced lawyer uses all sorts of stratagems to minimize the effect on the judge or jury of testimony disadvantageous to his client, even when the lawyer has no doubt of the accuracy and honesty of that testimony. . . . If such a witness happens to be timid, frightened by the unfamiliarity of court-room ways, the lawyer, in his cross-examination, plays on that weakness, in order to confuse the witness and make it appear that he is concealing significant facts. Longenecker, in his book *Hints On The Trial of a Law Suit* (a book endorsed by the great Wigmore), in writing of the 'truthful, honest, over-cautious' witness, tells how 'a skilful advocate by a rapid cross-examination may ruin the testimony of such a witness.' The author does not even hint any disapproval of that accomplishment. Longenecker's and other similar books recommend that a lawyer try to prod an irritable but honest 'adverse' witness into displaying his undesirable characteristics in their most unpleasant form, in order to discredit him with the judge or jury. 'You may,' writes Harris, 'sometimes destroy the effect of an adverse witness by making him appear more hostile than he really is. You may make him exaggerate or unsay something and say it again.' Taft says that a clever cross-examiner, dealing with an honest but egotistic witness, will 'deftly tempt the witness to indulge in his propensity for exaggeration, so as to make him "hang himself." 'And thus,' adds Taft, 'it may happen that not only is the value of his testimony lost, but the side which produces him

victing the innocent permits counsel to put the State to its proof, to put the State's-case in the worst possible light, regardless of what he thinks or knows to be the truth. Undoubtedly there are some limits which defense counsel must observe[7] but more often than not, defense counsel will cross-examine a prosecution witness, and impeach him if he can, even if he thinks the witness is telling the truth, just as he will attempt to destroy a witness who he thinks is lying. In this respect, as part of our modified adversary system and as part of the duty imposed on the most honorable defense counsel, we countenance or require conduct which in many instances has little, if any, relation to the search for truth.

I would not extend this system, at least as it presently operates, to police investigations and would not require counsel's presence at pretrial identification procedures. Counsel's interest is in not having his client placed at the scene of the crime, regardless of his whereabouts. Some counsel may advise their clients to refuse to make any

---

suffers for seeking aid from such a source'—although, I would add, that may be the only source of evidence of a fact on which the decision will turn.

" 'An intimidating manner in putting questions,' writes Wigmore, 'may so coerce or disconcert the witness that his answers do not represent his actual knowledge on the subject. So also, questions which in form or subject cause embarrassment, shame or anger in the witness may unfairly lead him to such demeanor or utterances that the impression produced by his statements does not do justice to its real testimonial value.' "

[7] See the materials collected in c. 3 of Countryman & Finman, The Lawyer in Modern Society; Joint Committee on Continuing Legal Education of American Law Institute and the American Bar Association, The Problem of a Criminal Defense 1–46 (1961); Stovall, Aspects of the Advocate's Dual Responsibility, 22 The Alabama Lawyer 66; Gold, Split Loyalty: An Ethical Problem for the Criminal Defense Lawyer, 14 Clev.-Mar. L. Rev. 65; Symposium on Professional Ethics, 64 Mich. L. Rev. 1469–1498.

movements or to speak any words in a lineup or even to appear in one. To that extent the impact on truthful factfinding is quite obvious. Others will not only observe what occurs and develop possibilities for later cross-examination but will hover over witnesses and begin their cross-examination then, menacing truthful factfinding as thoroughly as the Court fears the police now do. Certainly there is an implicit invitation to counsel to suggest rules for the lineup and to manage and produce it as best he can. I therefore doubt that the Court's new rule, at least absent some clearly defined limits on counsel's role, will measurably contribute to more reliable pretrial identifications. My fears are that it will have precisely the opposite result. It may well produce fewer convictions, but that is hardly a proper measure of its long-run acceptability. In my view, the State is entitled to investigate and develop its case outside the presence of defense counsel. This includes the right to have private conversations with identification witnesses, just as defense counsel may have his own consultations with these and other witnesses without having the prosecutor present.

Whether today's judgment would be an acceptable exercise of supervisory power over federal courts is another question. But as a constitutional matter, the judgment in this case is erroneous and although I concur in Parts I and III of the Court's opinion I respectfully register this dissent.

MR. JUSTICE FORTAS, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join, concurring in part and dissenting in part.

1. I agree with the Court that the exhibition of the person of the accused at a lineup is not itself a violation of the privilege against self-incrimination. In itself, it is no more subject to constitutional objection

than the exhibition of the person of the accused in the courtroom for identification purposes. It is an incident of the State's power to arrest, and a reasonable and justifiable aspect of the State's custody resulting from arrest. It does not require that the accused take affirmative, volitional action, but only that, having been duly arrested he may be seen for identification purposes. It is, however, a "critical stage" in the prosecution, and I agree with the Court that the opportunity to have counsel present must be made available.

2. In my view, however, the accused may not be compelled in a lineup to speak the words uttered by the person who committed the crime. I am confident that it could not be compelled in court. It cannot be compelled in a lineup. It is more than passive, mute assistance to the eyes of the victim or of witnesses. It is the kind of volitional act—the kind of forced cooperation by the accused—which is within the historical perimeter of the privilege against compelled self-incrimination.

Our history and tradition teach and command that an accused may stand mute. The privilege means just that; not less than that. According to the Court, an accused may be jailed—indefinitely—until he is willing to say, for an identifying audience, whatever was said in the course of the commission of the crime. Presumably this would include, "Your money or your life"—or perhaps, words of assault in a rape case. This is intolerable under our constitutional system.

I completely agree that the accused must be advised of and given the right to counsel before a lineup—and I join in that part of the Court's opinion; but this is an empty right unless we mean to insist upon the accused's fundamental constitutional immunities. One of these is that the accused may not be compelled to speak. To compel him to speak would violate the priv-

ilege against self-incrimination, which is incorporated in the Fifth Amendment.

This great privilege is not merely a shield for the accused. It is also a prescription of technique designed to guide the State's investigation. History teaches us that self-accusation is an unreliable instrument of detection, apt to inculpate the innocent-but-weak and to enable the guilty to escape. But this is not the end of the story. The privilege historically goes to the roots of democratic and religious principle. It prevents the debasement of the citizen which would result from compelling him to "accuse" himself before the power of the state. The roots of the privilege are deeper than the rack and the screw used to extort confessions. They go to the nature of a free man and to his relationship to the state.

An accused cannot be compelled to utter the words spoken by the criminal in the course of the crime. I thoroughly disagree with the Court's statement that such compulsion does not violate the Fifth Amendment. The Court relies upon *Schmerber* v. *California*, 384 U. S. 757 (1966), to support this. I dissented in *Schmerber,* but if it were controlling here, I should, of course, acknowledge its binding effect unless we were prepared to overrule it. But *Schmerber,* which authorized the forced extraction of blood from the veins of an unwilling human being, did not compel the person actively to cooperate—to accuse himself by a volitional act which differs only in degree from compelling him to act out the crime, which, I assume, would be rebuffed by the Court. It is the latter feature which places the compelled utterance by the accused squarely within the history and noble purpose of the Fifth Amendment's commandment.

To permit *Schmerber* to apply in any respect beyond its holding is, in my opinion, indefensible. To permit

its insidious doctrine to extend beyond the invasion of the body, which it permits, to compulsion of the will of a man, is to deny and defy a precious part of our historical faith and to discard one of the most profoundly cherished instruments by which we have established the freedom and dignity of the individual. We should not so alter the balance between the rights of the individual and of the state, achieved over centuries of conflict.

3. While the Court holds that the accused must be advised of and given the right to counsel at the lineup, it makes the privilege meaningless in this important respect. Unless counsel has been waived or, being present, has not objected to the accused's utterance of words used in the course of committing the crime, to compel such an utterance is constitutional error.*

Accordingly, while I join the Court in requiring vacating of the judgment below for a determination as to whether the identification of respondent was based upon factors independent of the lineup, I would do so not only because of the failure to offer counsel before the lineup but also because of the violation of respondent's Fifth Amendment rights.

---

*While it is conceivable that legislation might provide a meticulous lineup procedure which would *satisfy* constitutional requirements, I do not agree with the Court that this would "remove the basis for regarding the [lineup] stage as 'critical.'"