Lee Clifton WILSON, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 54458–54460.

Supreme Court of Missouri,
Division No. 1.

Nov. 9, 1970.

Harold L. Holliday, Sr., Harold L. Holliday, Jr., Kansas City, for appellant.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

HIGGINS, Commissioner.

Consolidated appeals from denial, after evidentiary hearing, of three motions under Criminal Rule 27.26, V.A.M.R., to vacate and set aside judgments of conviction entered on pleas of guilty to charge of murder, first degree, and two charges of forcible rape. Appellant was sentenced to life imprisonment on each charge.

Appellant's first contention is that he was subjected to lineups which deprived him of due process "in their suggestiveness and serve to coerce (his) pleas of guilty."

This contention is somewhat novel in that charges of improper pretrial confrontations usually appear in cases involving in-court identification during trial based upon pre-trial lineup confrontation. See, e. g., United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; State v. DeLuca, Mo., 448 S.W.2d 869; State v. Mentor, Mo., 433 S.W.2d 816. In such cases, in-court identification based upon prior constitutionally improper confrontation is a denial of due process unless the in-court identification has an independent source, United States v. Wade, supra, and the prejudice comes from the use of the identification as direct evidence to convict. The contention here, however, is not directed against any use by the state of an allegedly improper pretrial confrontation, but is to charge that an improper pretrial lineup coerced him to plead guilty.

The murder was committed July 22, 1965; the rapes were committed one on July 17, 1965, and the other on July 23, 1965. The lineup occurred August 3, 1965, and since the standards of United States v. Wade, supra, including the right to counsel at a pretrial lineup, were not effective prior to June 12, 1967, Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, the propriety and effect of the lineup is determined from the "totality of circumstances" involved. State v. Blevins, Mo., 421 S.W.2d 263, 267[2]; State v. Reeder, Mo., 436 S.W.2d 629, 630[1].

In support of his contention that the lineup was improper appellant's only evidence was that he, "a light colored and small Negro," was shown with a "real dark black Negro" and "a real large and fat Negro." Assuming, arguendo, that such evidence describes a suggestive lineup, it is not conclusive on the alleged resulting coercion, and his further testimony presents a conclusive refutation of his allegation:

"THE COURT: Is there anything else you would like to add in explaining about that first allegation as to the lineup?

"THE WITNESS (Wilson): What I am speaking of is this. See, they showed my picture on TV and everything, and got all these people down to try to identify me. That is why I was thinking I was violated in my constitutional rights, because a lawyer should have been there to help assist me. THE COURT: Do you think that hurt you in any way later? * * * THE WITNESS: No, it didn't hurt me. * * *

"Redirect Examination by Mr. Holliday (counsel for movant):

"Q Did the lineup identification about which you complain have any effect upon your decision to enter a plea of guilty, Mr. Wilson? A No, it didn't. Q I mean did you feel that the fact that you had been identified in the lineup would make it difficult for you to win the case if it were tried? A No, I didn't. If I was identified in the lineup, well, I just wanted someone there to assist me, that is all. * * *"

■ Thus, the total circumstances, and particularly appellant's own admissions, demonstrate that his lineup did not "coerce" his pleas of guilty, and the court's finding that movant failed to sustain his burden of proving his allegation with respect to the lineup may not, on such record, be said to be "clearly erroneous." Crosswhite v. State, Mo., 426 S.W.2d 67, 70[1].

Appellant contends next that he was denied effective assistance of counsel "in that counsel advised, urged and coerced (him) to plead guilty. * * *" Appellant's argument is that "these urgings of defense counsel were coupled with the veiled threat that if the pleas were not entered the Movant-Appellant would be sentenced to death, whereas Movant-Appellant's life would be spared if he would enter a guilty plea." He complains also that counsel did not advise him that it had been twenty years since anyone had been executed upon conviction for rape in Jackson County, and that counsel did not provide the necessary "detailed consultation and investigation." (Chase v. Robbins, 1 Cir., 408 F.2d 1350, 1354.)

Appellant testified that his attorney told him that if he pleaded guilty he would get life sentences "and that if I go to trial with them I would stand a great chance of losing them. If I lost any one of these charges I would be given a death penalty for it. Well, I formed my opinion that I had no alternative but to plead guilty to them or get the gas chamber for it." Counsel told him the state had a pretty good case, and he advised that the state had the pistol. He acknowledged that positive identifications had been made but emphasized differences in descriptions in depositions of certain witnesses. He denied guilt, saying he pleaded so only because of the advice of counsel. He acknowledged that present counsel, Mr. Holliday, had also advised him from his investigation "that the State has a strong case in each one of these three charges" and that it would be his "opinion as a lawyer that if the guilty plea were set aside and a new trial was

given * * * that (it) * * * in all probability wouldn't benefit your situation * * * that a life sentence would probably be imposed in all three cases * * * and * * * that there is the possibility that a death sentence may be imposed." He also acknowledged that his previous attorney had advised him of the range of punishment, including the death penalty; that he had obtained agreement from the prosecuting attorney to recommend life sentences, and that the court probably would accept the prosecutor's recommendation. He was present during the depositions and knew from them the strength of the state's cases.

Counsel for appellant was Mr. J. Arnot Hill, appointed August 17, 1965. The record shows that Mr. Hill was the Chief Defender in the Legal Aid and Defender Office in Kansas City, Missouri, and that both he and Mr. Whitfield Moody of that office were appointed to represent appellant. Mr. Hill was admitted to the Bar in 1936 and, except for four years during World War II, has been engaged in the trial of criminal cases both as prosecuting attorney and defense counsel. His experience has provided an insight to juries' performances and he has been recognized as one of the foremost practitioners of criminal law around Kansas City. To fully appreciate the task facing counsel in representing appellant, the offenses with which his client was charged should be noted and their nature is digested from their description in the transcript of proceedings on the guilty pleas to such offenses:

On July 22, 1965, Margaret Garnet, age 66, saw defendant, "a colored man," in her home. She got up and screamed at him and he turned a shotgun which he was holding on her husband, Daisey Garnet, fired and killed him instantly. He then turned the gun on her, took $23, and left.

On July 17, 1965, appellant entered the Boxberger home, put a gun on Mr. and Mrs. Boxberger, forced her to undress, and ravished her. He then, under threat of his gun, forced her to perform oral copulation on him. Next, he struck Mr. Boxberger with the gun, knocking him to the floor, and forced him to perform a similar act on his wife. Finally, under the same threat and after several blows with the gun, he forced Mrs. Boxberger to produce her 9-year-old daughter who he forcibly instructed to witness performance of another forced oral copulation on him by the mother, after which he attempted to ravish the child. When finished with the child, he again forced Mrs. Boxberger into an act of oral copulation, after which he tied Mr. and Mrs. Boxberger, ransacked the house and took some personal property. Throughout these events, there were racial overtones mentioned by appellant.

On July 23, 1965, appellant entered the Bearden home, placed a gun on Mr. and Mrs. Bearden and forced them to undress. He tied Mr. Bearden's hands behind his back, forced Mrs. Bearden to an act of oral copulation upon her husband, after which appellant ravished her and forced her to an act of oral copulation on him. He stuffed a rag into Mr. Bearden's mouth to keep him from screaming and he struck both victims several times with his gun. Appellant also took a small amount of money from the house when he left.

Mr. Hill saw his client on six or seven occasions at the jail. On January 28, 1966, in order to insure understanding of his evaluation of the cases, he wrote a letter to appellant:

"As you know, you are presently charged by indictment with murder in the first degree and with two charges of rape. There have been no preliminary hearings on these charges for the reason that you are charged by indictment and not by information. Most of the information that I have concerning these crimes comes from items in the Kansas City Star and from conversations with the Prosecuting Attorney.

"From the information that I have the murder charge concerns a murder that was committed in the perpetration of a robbery. Both of the rape cases were extremely

aggravated. In one of the rape cases the person committing the crime bragged about being a Black Muslim. In my preliminary conversations with the Prosecuting Attorney he announced that he would ask for the death penalty in each of the cases and that he wanted to try the aggravated rape case first. This is the case where a mother was raped and her daughter was forced to commit an unnatural sex act on the person committing the crime.

"According to the Prosecuting Attorney, he has ample identification to establish that you were the person who committed these crimes and also has physical and scientific evidence establishing that the murder victim was shot with your gun and that your gun was found near you at the time of your arrest.

"Since that time Mr. Gepford, the Prosecuting Attorney, has stated that if you wish to plead guilty to these offenses as charged, he will recommend a life sentence in each of them and I am sure that the Court will follow his recommendations and will not assess the death penalty.

"I am sure that you are aware of the risks involved in trying any of these cases. This is not a matter in which a lawyer can tell you what to do. It is your life to risk or preserve as you see fit. In the event you wish to stand trial I will start next week to take the depositions of witnesses so that we may know exactly what we are confronted with. However, after I start to do this, it will indicate to the Prosecutor that you have turned down his offer and he will proceed to make every effort to send you to the gas chamber.

"I, of course, cannot ethically advise an innocent man to plead guilty to something he did not do and have not written this letter for that purpose. However, if you are guilty, you should plead guilty at this time."

Appellant continued to maintain his innocence and Mr. Hill asked the prosecuting attorney to elect which case he wished to try first in order to limit his preparations to that case. The prosecution chose to try the Boxberger rape case and Mr. Hill proceeded to take depositions of witnesses endorsed on that charge. He also checked appellant's background, and did so sufficiently to determine he was an improbable suspect in that he learned that he was married and had a good service and work record. He arranged for an interview with Dr. Owre at the Psychiatric Receiving Center, who advised that appellant was not a candidate for a defense based on lack of mental responsibility. With respect to the possibility of a death penalty, Mr. Hill recognized that executions had been rare in recent years but in this case (the Boxberger case) the circumstances "were so abominable that I felt it would simply outrage a jury, and that a death penalty could easily come. * * *" In addition to the eyewitnesses' identifications (under circumstances showing ample time in which to see and form independent bases for identification), counsel also learned through his investigation, depositions, and preparations that the state could show that a jackknife was found in appellant's possession which came from the Boxberger home. Counsel's opinion was "that while death penalties are very rare, a case of this aggravation is also very rare." Counsel was never able to develop an alibi defense in that the best defendant could do was to say "he was cutting grass at home * * * around 10:00 o'clock at night, which could have been. I didn't rule it out as being ridiculous." Some attempt was made to suggest discrepancies with respect to whether appellant wore a beard which counsel considered could have been explained by the equally definite possibility that the beard or mustache or goatee, if so, was artificially donned.

■ It does not follow from this recital that counsel coerced a guilty plea from his client as opposed to counsel making detailed analyses of, and giving sound advice on, the situation and alternatives facing appellant upon which he chose to plead guilty;

and, accordingly, the court's finding against appellant's charge of ineffective assistance of counsel may not be said to be "clearly erroneous." Crosswhite v. State, supra; and note 426 S.W.2d l.c. 71[4, 5], where a similar charge was made in a capital case and the court held that counsel "may have urged the defendant to enter a plea of guilty and avoid the possibility of being hanged is not necessarily evidence of incompetence. * * * The advice given could have been good advice. Defendant did not sustain his burden. * * *" It may not be said on this record that counsel's performance "blotted out the essence of any substantial defense," Bruce v. United States, 126 U.S.App.D.C. 336, 379 F.2d 113; or that counsel's performance was a farce or mockery of justice, Cardarella v. United States, 8 Cir., 375 F.2d 222.

Finally, appellant contends his guilty pleas were "involuntary as a result of misapprehension and coercion." The argument is that the previous points "establish sufficient harrassment and coercion as to justify (his) pleas being set aside."

It has already been demonstrated that appellant failed to establish any "harassment and coercion" on account of alleged improper lineup and ineffective assistance of counsel. That situation alone warrants a denial of his final point which relies on establishment of those points; however, there is yet additional record to refute his contention of involuntary guilty pleas. In each case, i. e., the murder charge and each rape charge, colloquy took place between court, defendant, and counsel, and these excerpts are typical:

"THE COURT: If he wishes to plead guilty to a charge as serious as the one here presented, it is best that you develop in detail his understanding of the plea that he desires to enter. Will you proceed to do so, Mr. Hill?

"MR. HILL: Mr. Wilson, you and I have consulted on this matter as to whether you should enter a plea of guilty in this charge? THE DEFENDANT: Yes. MR. HILL: And this morning you had a chance to visit with your wife? THE DEFENDANT: Yes, sir. MR. HILL: Is it your desire to follow my advice and enter a plea of guilty to this charge? THE DEFENDANT: Yes, sir. * * *

"MR HILL: Are you entering that plea because you are, in fact, guilty? THE DEFENDANT: Yes, sir. MR. HILL: And I believe that I have told you that the first degree murder carries one of two punishments, it either has to be a life sentence or it does carry the death penalty? THE DEFENDANT: Yes, sir, you did tell me. MR. HILL: And you still wish to enter a plea of guilty to the charge? THE DEFENDANT: Yes, sir. THE COURT: Mr. Waterman, is there anything you would like to develop in more detail? MR. WATERMAN: Your Honor, I would just like to inform the Court of the facts of the case. THE COURT: Well, I mean as far as accepting the plea of guilty.

"MR. WATERMAN: Yes, I would like to—Mr. Wilson, you fully understand that there have been no threats made against you, or promises made to you, or any coercion or inducement which would cause you to enter this plea? In other words, have you been threatened in any way to make this plea? THE DEFENDANT: No, I haven't. MR. WATERMAN: Have you been threatened or coerced to make this plea? THE DEFENDANT: No, I haven't. MR. WATERMAN: Has anyone from the State or from the Police Department ever contacted you and requested that you plead guilty? THE DEFENDANT: No, sir. MR. WATERMAN: You are pleading guilty freely and voluntarily of your own free will at this time? THE DEFENDANT: Yes, I am. MR. WATERMAN: That is all I have.

"THE COURT: Has anybody led you to believe that if you entered a plea of guilty the Court might be easier on you than a jury would be? THE DEFENDANT: Yes. THE COURT: You say they have?

THE DEFENDANT: No, no, no. THE COURT: You understand what your attorney Mr. Hill told you a few minutes ago that when you enter a plea of guilty there are two punishments that could be assessed, either the death penalty and the gas chamber or a life imprisonment? THE DEFENDANT: Yes. THE COURT: Those are the only two alternatives as far as the punishment that might be assessed? THE DEFENDANT: Yes, sir. THE COURT: Very well, the plea of guilty is accepted in C-34598, the murder first degree charge."

Then followed the description of the murder case and, in their turn, descriptions of the rape cases. Also included in the proceedings was the description of the appellant, a 26-year-old man whose mother was a teacher, whose brother was a university student, and who, himself, was a high school graduate. He had a sound work and service record, was married, and a churchman. He was said to be mentally keen, capable of analysis, and to know exactly what he was doing at the time of his pleas. The defendant's own response to questions from the court in each instance as to what he would say was, "The only thing I can say is that I am pleading guilty to a life sentence in this charge. I am guilty of it and I plead guilty to it."

Again, on this record, it may not be said that the court's finding that appellant's guilty pleas were voluntarily entered is "clearly erroneous." Crosswhite v. State, supra.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.