**UNITED STATES of America**

v.

**Hilliard McQUEEN, et al., Appellant in No. 19567.**

**Appeal of Ronald Johnson SHEFFIELD, Appellant in No. 19568.**

Nos. 19567, 19568.

United States Court of Appeals, Third Circuit.

Argued Sept. 27, 1971.

Decided Feb. 8, 1972.

Theodore L. Van Winkle, Rutherford, N. J., argued for appellant McQueen.

Dudley A. Schlosser, Hoboken, N. J., argued for appellant Sheffield.

W. Hunt Dumont, Asst. U. S. Atty., Newark, N. J. (Herbert J. Stern, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before SEITZ, Chief Judge and HASTIE, Circuit Judge and HERMAN, District Judge.

## OPINION OF THE COURT

HASTIE, Circuit Judge.

These appeals have been taken by two men who were convicted in a single trial of bank robbery, attended by endangering life with a firearm, in violation of sections 2113(a) and (d) of Title 18, United States Code.

The evidence showed that the Springfield Avenue branch of the Howard Savings Institution in Newark, New Jersey, was robbed shortly after 9 a.m. on September 18, 1969 by two Negroes, one of whom stood near the entrance holding the employees at bay at gunpoint while the other jumped over the counter and removed more than $10,000 from the tellers' cash drawers. The stolen money included bills the serial numbers of which had been recorded in anticipation of possible robbery.

A principal witness against the appellants was Alexander Holloway, who had been indicted with them but had pleaded guilty. He testified in detail concerning the planning and execution of the robbery by the appellants and himself. He testified that the robbery had been proposed by appellant McQueen and was planned for September 16, but that a report made by McQueen as a result of his observation of the bank on that day caused the postponement of the robbery until September 18. He described the events of September 18 in detail stating that he and Sheffield entered the bank where Sheffield held the occupants at bay while Holloway rifled the cash drawers, after which they fled on foot. It had been prearranged that appellant McQueen, neatly dressed, "in a green suit with a yellow tie, posing as an insurance man or something" and carrying an attache case, would be waiting a short distance down Springfield Avenue at a housing project. When Holloway reached that point, he handed a paper bag, containing the stolen money and a gun to McQueen. Then, as prearranged, Holloway continued on his way and McQueen went into the housing project.

McQueen was arrested as he left the housing project less than thirty minutes after the robbery. The arresting officers searched an attache case McQueen was carrying and found a gun and some $5,000, including some of the stolen bills bearing numbers that previously had been recorded. Holloway and appellant Sheffield were arrested a few days later.

At a pretrial hearing on a motion to suppress the evidence obtained by searching McQueen's attache case, an agent of the Federal Bureau of Investigation testified that, sometime before the event, confidential information had been received from an informant, who in the past had proved reliable, that McQueen and others were planning to rob a bank near the housing project on September 16 and to escape into the project. One of their number was to wait at the housing project and to receive the stolen money from the fleeing robbers. He was to be dressed in a business suit and to wear a tie. Later he would come out of the project appearing to be unconnected with the crime. Therefore, according to the testimony of a Newark

detective, a stakeout of the Howard Savings Institution, the bank nearest the project was arranged on September 16. From a vantage point on the second floor of the bank the detective saw McQueen and Sheffield walking about for some time in front of the bank, behind it and across an adjacent parking lot. The detective also testified that two days later, responding to a radio broadcast announcing the actual holdup, policemen immediately attempted to surround the housing project toward which the robbers had fled. A few minutes later he himself saw McQueen coming out of a project building dressed as predicted in the informant's story and carrying an attache case. He ordered two patrolmen to arrest McQueen. An immediate search of McQueen's attache case disclosed a gun and a large amount of currency.

The motion to suppress was denied. The seized items, including the marked bills which were duly identified as part of the stolen money, were introduced in evidence at the appellants' trial. In the circumstances of this case we agree with the district court that the arrest and the attendant search of the attache case were lawful and in accordance with the concept of justifying probable cause elaborated in the authoritative and strikingly similar case of Draper v. United States, 1959, 358 U.S. 307, 79 S. Ct. 329, 3 L.Ed.2d 327. *Cf*. Spinelli v. Texas, 1968, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637; Aguilar v. Texas, 1964, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723.

Another principal issue on this appeal concerns the identification of Sheffield as the robber who held the bank's occupants at bay. In addition to Holloway's account of the robbery, two tellers who witnessed the robbery made in court identifications of Sheffield as the robber who had held the gun. These two identifications are now challenged. Although the witnesses purported to have identified Sheffield in court through their recollection of his appearance during the robbery, they had also made pretrial identifications of photographs of Sheffield. It is now contended that these photographs had been exhibited in an improperly suggestive way and that this procedure had so influenced the witnesses as to make them incompetent as identification witnesses at trial.

No mention was made of prior photographic identification on the direct examination of these witnesses. However, on cross-examination the defense elected to ask each of them in the presence of the jury whether she had made pretrial photographic identification of Sheffield and in what circumstances. The appellants cannot properly object that the jury received information that the defense chose to introduce in evidence. Thus, this is not a case where the prosecution is charged with improperly introducing as evidence of guilt the fact that the witness had made a pretrial photographic identification.[1] The matter now in controversy is solely whether the court erred in refusing to hold that the face to face identifications made at trial were inadmissible.

The witnesses in question, Mrs. Cohen and Mrs. Fiori, were bank tellers who had witnessed the robbery. Their direct testimony showed that throughout the robbery they had an unobstructed view of the man who was pointing a gun toward them at short distance. There was no suggestion that his face was in any way covered or hidden. On cross-examination the defense obtained testimony from Mrs. Cohen that during the investigation of the crime a number of photographs had been shown to her and that she had identified Sheffield's picture as the likeness of the robber who had held and pointed the gun. Similar testimony was elicited from Mrs. Fiori.

---

1. Accordingly, the first point decided by this court in United States v. Zeiler, 1970, 427 F.2d 1305, is not presented by this appeal. Judge Seitz does not read *Zeiler* as restrictively as does the majority. However, he agrees that *Zeiler* is inapplicable because the critical events preceded the *Zeiler* decision.

Both women testified that several pictures were shown them routinely without any reference to a particular picture or pictures. The officer who exhibited the pictures also testified that the attention of the witnesses was not directed to any particular picture. However, he also testified that the photographs included two prints each of Holloway, Sheffield and a third person and only a single print of each of five other men. He also testified that all eight men were young Negroes of somewhat similar appearance. Neither witness identified both prints of Sheffield.

Sheffield's basic argument is that the exhibition of both close-up and full length photographs of three men, including himself, and only close-ups of the other five men increased the probability that the witness would focus upon and select his photograph. Beyond this it has not been argued that anything about Sheffield's picture itself or the manner of its exhibition improperly suggested that this was a picture that the police hoped to have identified. We have examined all of the photographs, which are included in the present record. There were eight separate prints of "mug shots" of eight different men, among them Sheffield, Holloway and McQueen. Each of the eight prints consisted of two close-up pictures of an individual, one front face and the other side face. In addition to these eight prints there were three separate full length snapshots taken from a greater distance, one of Holloway, one of Sheffield and one of a third person. Facial details were smaller and not as clear in these as in the close-ups. No witness was able to identify the less distinct photograph of Sheffield in the full length snapshot. Mrs. Cohen and Mrs. Fiori did identify Sheffield's close-up likeness as a picture of the robber who held the gun.

■ Since no one recognized both the more distant and the close-up photo-graphs of Sheffield as pictures of the same man, we do not see how any suggestivity could have resulted from the showing of the additional snapshots.[2] Beyond that, we agree with the district court that nothing appeared on the face of any picture or pictures and nothing else has been shown that might cause either witness to believe that the police wanted her to identify Sheffield. The action of the district court in permitting the witnesses Cohen and Fiori to make courtroom identifications of Sheffield was consistent with the reasoning of the Supreme Court in Simmons v. United States, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 and United States v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 as well as the reasoning and holdings of this court in United States v. Zeiler, 1970, 427 F.2d 1305.

Next, appellant McQueen complains that police officers were improperly permitted to testify as to the substance of statements that he allegedly made to them during the course of interrogation while he was in custody and without counsel.

The case for the prosecution contained no mention of any such statements. McQueen took the stand in his own defense and testified that he had not participated in the charged wrongdoing. On cross-examination the prosecutor sought to discredit this denial by asking him whether he had not admitted during police interrogation that he had participated in the crime. When objection was made to this line of inquiry the court excused the jury and permitted both sides to offer testimony as to the circumstances and details of the interrogation. The prosecutor then asked McQueen whether he had not made a number of specific admissions amounting to a confession of his role in the robbery. He steadfastly denied that he had made any admissions at all. He did admit that he had been advised of his right to

---

2. At most it could be said that if the witness were merely guessing the odds were only nine to two against a random selection of a picture of Sheffield, but ten to one against selection of certain others.

remain silent and to have counsel. Investigating officers were called next. They testified that they had advised McQueen fully of his rights and that he stated that, since he had been caught red handed, he was willing to tell them the circumstances of the robbery but that he would sign nothing without the advice of counsel. Then, according to the officers, he confessed fully and at length.

At the conclusion of this inquiry, the jury was recalled and both McQueen and the officers were permitted to repeat to the jury their versions of the interrogation. Throughout the presentation of this matter, the prosecution maintained that it was offering evidence of McQueen's oral admissions solely to attack his credibility by showing prior statements inconsistent with his testimony at trial.

█ On the present record it may be arguable that McQueen did not effectively waive his right to counsel before or during interrogation. But it is now established that this circumstance alone does not preclude the use of a voluntary and uncoerced statement of the accused to attack the credibility of his trial testimony. Harris v. New York, 1970, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1. Therefore, the admissibility of the alleged statements depends upon their voluntariness.

█ An unusual aspect of this case is that McQueen never contended and does not now contend that he had been coerced into incriminating admissions. Rather, he has consistently insisted that he had told the officers nothing about the crime. Thus, there was conflicting testimony before the court, and later the jury, only on the question whether McQueen had in fact made incriminating admissions. The officers' testimony that whatever he said was said voluntarily was not rebutted by any evidence of coercion. If McQueen was believed, he had said nothing. If the officers were believed, he had voluntarily admit-

ted his complicity. Certainly the court and the jury were entitled to credit the officers' version. And, in any event, the evidence provided no basis for a third alternative finding, that he made admissions under coercion. We find no reversible error in the court's handling or disposition of this matter.

The appellants also have argued that on several occasions during this two week trial improper acts or omissions of the prosecutor so prejudiced the defendants that fairness requires a new trial. We have considered each episode of which appellants complain. On several occasions the conduct of the prosecutor was less than exemplary. But we are satisfied that the matters of which appellants complain were not of such character as to influence the outcome of this trial.

█ This is not a case where the evidence of guilt was weak, or the evidence for the defense very strong. Such items as the testimony of Holloway, the eyewitness identifications of Sheffield and the arrest of McQueen thirty minutes after the robbery with part of the stolen money in his possession make a very strong case. The principal evidence offered by the defense consisted of no more than Sheffield's testimony that he was at home when the robbery occurred and McQueen's explanation that the money found in his possession had been collected from business ventures in which he had an interest. In short, this was not such a case as would create a risk that relatively minor improprieties in things said and done by the prosecutor might have prejudiced the defense in any significant way. We conclude that the questioned conduct of the prosecutor did not constitute reversible error here, though our conclusion might be different in other circumstances.

No other contention of the appellants is sufficiently substantial to require discussion.

The judgment will be affirmed.