UNITED STATES of America

v.

John W. CLARK.

Crim. A. No. 71–163.

United States District Court,
E. D. Pennsylvania.

June 28, 1972.

J. Clayton Undercofler, III, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Nino V. Tinari, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

This case comes before the Court on a motion for judgment of acquittal or for a new trial. First, the defendant, John Clark, asserts that the denial of counsel of his choice at a lineup resulted in tainted identifications, and secondly, that his reprosecution after an earlier mistrial placed him in double jeopardy. These issues arose from the defendant's arrest and conviction for participating with at least five other men in a robbery of a branch office of the Southeastern National Bank at Exton, Pennsylvania, in February, 1971.

## LINEUP

The events of the lineup in question were fully explored at a hearing held June 18, 1971, on a motion to suppress identification testimony.

Lt. Bernard Margolis, a Philadelphia police officer who conducted the lineup, stated it was first scheduled for March 4, 1971.[1] However, at the request of Nino V. Tinari, Esquire, defendant's attorney, the lineup was postponed for one week. Counsel was to attend or have someone from his office appear. The day before the new date, Mr. Tinari's office was reminded of it by a telephone call from Lt. Margolis. On March 11, the date set for the lineup, at about 5:05 P. M., Lt. Margolis talked to Mr. Tinari concerning the standup for that evening. Mr. Tinari was surprised that Clark had not made bail and requested time to verify the incarceration of his client. Having received no return call by about 5:30 P.M., Lt. Margolis telephoned Mr. Tinari, who then promised that he would be present for the 9:00 P.M. lineup. However, when Mr. Tinari had not appeared by 8:30 P.M., Lt. Margolis attempted to call him again. There was no response to the telephone calls to the attorney's office and the lieutenant was unable to obtain a home number. A Philadelphia assistant district attorney also tried to reach Mr. Tinari, but without success. Finally, at 11:00 P.M., the lineup here being questioned was held. Mr. Tinari had still not appeared, and did not appear thereafter.

In view of Mr. Tinari's unexplained absence, two members of the Public Defender's Office agreed to represent Clark. At their request, changes were made in the relative positions of the eight men in the lineup. However, once these changes were made, the Defenders made no objection to the police concerning the lineup and neither was called as a witness at the suppression hearing. The defendant, who had to be forcibly brought to the room, did object to participating in a lineup in the absence of his chosen attorney.

When the array was finalized, it was photographed in color and the witnesses were admitted. After viewing the lineup each witness was escorted to a separate room and individually interviewed. Three persons from the bank all identified[2] Clark as the robber who wore the "police uniform" during the holdup. At the lineup, all the men wore the same type of prison garb and none were asked to try on a "police uniform"

---

1. The record is confused as to which day was involved. At the suppression hearing, Lt. Margolis testified that this lineup was scheduled for March 3, 1971. However, such arrays are normally conducted on a Thursday and later discussion and testimony indicate that Thursday, March 4, 1971, was the correct date.

2. The identifications were not "positive", a matter that was explored at trial.

or anything else. Like Clark, all the participants in the array were young Negro males. There was no great disparity in their appearances [3] and nothing to suggest that Clark was the man to be chosen. However, they were not all of the same weight, height, complexion, or facial characteristics.[4]

■ Another important fact must be kept in mind. There were at least six men involved in this holdup, five of whom entered the bank. The identification witnesses were not told which of the men they were to try to identify. Having presided over the trial of three of the other alleged robbers, I know that they differed from Clark and from each other in size, complexion, facial characteristics, and dress. One was referred to as a priest by reason of his garb, another as the man with a Fu Man Chu moustache, a third as having worn a gray coat and Clark as the man in the policeman's uniform. Thus, the witnesses were not looking for a single individual from among those whom they saw at the lineup, but were looking for five men, or any one of them. They all chose Clark and they all remembered him as having been the one who was wearing the police uniform. Any minor variations in physical characteristics did not prejudice Clark, but presented the witnesses with the possibility of selecting one of the other men and overlooking Clark.

■ At first glance, it might appear that Clark has a valid objection to the lineup procedure since it was a critical stage of the prosecution and one at which an accused is entitled to have his counsel present: United States v. Wade, 388 U.S. 218, 236–237, 87 S.Ct. 1926, 1937–1938, 18 L.Ed.2d 1149 (1967); Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). However, *Wade* contemplates that there may be circumstances when substitute counsel will be required so that the course of justice will not be obstructed. In United States v. Randolph, 143 U.S.App.D.C. 314, 443 F.2d 729 (1970), it was held that substitute counsel satisfied the requirements of *Wade*, while in United States v. Kirby, 138 U.S.App.D.C. 340, 427 F.2d 610 (1970), it is pointed out that substitute counsel may aid the defense by resolving the difficult problem of a defense attorney's appearance as a witness.

■ In the instant case, the police did all that they could to assure the presence of counsel. The lineup was postponed once at Mr. Tinari's request and he was then called to remind him of

| 3. | | | Age | Height | Weight |
|----|---|---|-----|--------|--------|
| | No. 1. | Gaddis | 19 | 5′8″ | 152 |
| | No. 2. | Stanton | 21 | 5′7″ | 153 |
| | No. 3. | Baldwin | 28 | 5′11″ | 173 |
| | No. 4. | Quillen | 21 | 5′11″ | 157 |
| | No. 5. | Clark (the deft.) | 28 | 5′11″ | 193 |
| | No. 6. | Artemus | 27 | 6′1″ | 167 |
| | No. 7. | Stays | 28 | 6′1″ | 157 |
| | No. 8. | Mathis | 22 | 6′1″ | 155 |

———◆———

4. There were extensive questions about mustaches and hair styles with regard to the men in the lineup. Since a moustache can be grown in a few days and removed in a few minutes and hair styles lend themselves to easy and rapid changes, such similarities or variations are not of great significance in a lineup conducted several weeks after the crime took place.

A question also arose about Clark's weight as compared to that of the other men. He was listed as weighing 193 pounds. Lt. Margolis said he thought Clark's weight at the time of the lineup was about 180 pounds (N.T., June 18, 1971, p. 53). After the suppression hearing, it was found he weighed 179 pounds (N.T., Aug. 3, 1971, p. 101).

the new date. Even when it was impossible to contact Mr. Tinari, the lineup was delayed until 11:00 P.M. to afford him the opportunity to be there.[5] No explanation was given to the police for his failure to attend, and none was given at the suppression hearing. Under the circumstances, one cannot help but speculate that it was a deliberate attempt to prevent the holding of the lineup. In any event, I conclude that counsel's absence was one which was contemplated by *Wade* and that substitute counsel which was provided adequately protected Clark's rights. It should be noted that there is no contention that substitute counsel was derelict or argued that Mr. Tinari could have done any more than the Public Defenders did do. The failure of the defense to call the Public Defenders at the suppression hearing indicates the testimony of Lt. Margolis may be accepted without question. A review of the facts as he related them, the lineup pictures, and the individual identification photographs of each participant in the lineup shows there was scrupulous fairness in all the procedures and that Clark's rights were protected by substitute counsel. For these reasons, it was not error to admit the testimony concerning the lineup identification and that of the in-court identification.

## MISTRIAL

In support of the motion for judgment of acquittal, Clark contends that his right not to be placed in jeopardy twice was infringed.

Prior to trial, the government had agreed that a de facto Jencks Act procedure would be followed, that is, the prosecutor would furnish to the defense a copy of any written statement made by a witness so that it could be used for purposes of cross-examination. (N.T. June 18, 1971, p. 107; N.T. June 23, 1971, pp. 17–19.) The first two days of

the trial had proceeded on this basis. The problem arose when the prosecution discovered at the conclusion of the session on the second day that it had not supplied to defense counsel certain lineup identification sheets prepared by government witnesses. These sheets contained information given by those who attended the lineup to indicate pertinent physical details. Although defense counsel, Mr. Tinari, knew that these statement forms probably existed because of his prior lineup experience (N.T. Feb. 28, 1972, p. 10), there was no indication that he was trying to create the grounds for a mistrial by not having specifically asked for them (N.T. June 23, 1971, p. 5). It was agreed that the mistake on the part of the attorney for the government was inadvertent.

The applicable portions of the Jencks Act, 18 U.S.C. § 3500, provide:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness . . . which relates to the subject matter as to which the witness has testified. . . .

(d) If the United States elects not to comply with an order of the court under subsection (b) . . . to deliver to the defendant any such statement, . . . the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interest of justice require that a mistrial be declared.

Before trial resumed on the morning of June 23, defense counsel, the government's attorney, and I discussed the matter in chambers. The statute presented two alternatives: to strike the testimony concerning identification or to

---

5. The police were concerned that Mr. Tinari might not attend the lineup at all despite his assurances and their phone calls to him. Mr. Tinari's inability to be on time is further demonstrated by the fact that he was fifty minutes late for the suppression hearing on June 18, 1971, (N.T. p. 119) and four to five hours late for the trial itself. (N.T. Feb. 28, 1972, p. 3.)

declare a mistrial. At that point, witnesses had described an armed holdup, threats of death, and the herding of bank personnel and customers into the bank vault. There had been evidence that the defendant was one of the robbers, both from the eyewitnesses and from a large number of photographs which purported to show Clark's participation in the crime. Three bank employees had identified Clark and a fourth man, a customer, had indicated that Clark may have been one of the robbers but he was not sure. The cross-examination of these four witnesses had been completed and all had been excused. I felt it would be futile to strike the identification testimony of the bank employees and to instruct the jurors to erase it from their minds. Even if all of the testimony of these three witnesses had been stricken from the record, it would not have entitled the defendant to a judgment of acquittal because there was ample evidence from the customer to establish the corpus delicti and ample evidence from the photographs to establish Clark's identification. Therefore, neither from the practical point of view nor the technical point of view would an instruction to strike have been significant. The realities of the situation were discussed with defense counsel and he agreed (N.T. June 23, 1971, pp. 6–8).

A third possibility presented itself. The three witnesses could be recalled, the sheets made available to counsel, and the witnesses could be cross-examined as to their prior statements. Defense counsel agreed that this would be the best thing to do (N.T. June 23, 1971, p. 8, p. 34). At my request, he discussed the matter with defendant who indicated that he wished the trial to proceed with the testimony being stricken from the record and the jury being told to disregard it. The alternatives were then explained to Clark in open court. Clark continued to request that the testimony be stricken and was quite specific in saying that he did not want the witnesses recalled (N.T. June 23, 1971, pp. 37–40). Under the circumstances, I felt there was no choice and I declared a mistrial.

The defendant now argues that his retrial violates the prohibition against double jeopardy, citing United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L. Ed.2d 543 (1971). The standard to be used by courts when determining whether reprosecution is barred by a plea of former jeopardy was first set in United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). Speaking for the court, Mr. Justice Story stated that a jury can be discharged without the rendition of a verdict whenever under all the circumstances the Court exercising sound discretion finds there is a "manifest necessity" or "the ends of public justice would otherwise be defeated." The trial judge must always temper the decision as to whether or not to abort the trial with a consideration of the importance of submitting the issues to the jury which may be favorably disposed toward the defendant: United States v. Jorn, supra, 400 U.S. at 486, 91 S.Ct. at 558.

*Jorn* also cites examples in which the test of manifest necessity was properly applied:

> The *Perez* case has since been applied by this Court as a standard of appellate review for testing the trial judge's exercise of his discretion in declaring a mistrial without the defendant's consent. *E. g.*, Simmons v. United States, 142 U.S. 148 [12 S.Ct. 171, 35 L.Ed. 968] (1891) (reprosecution not barred where mistrial declared because letter published in newspaper renders juror's impartiality doubtful); Logan v. United States, 144 U.S. 263 [12 S.Ct. 617, 36 L.Ed. 429] (1892) (reprosecution not barred where jury discharged after 40 hours of deliberation for inability to reach a verdict); Thompson v. United States, 155 U.S. 271 [15 S.Ct. 73, 39 L.Ed. 146] (1894) (reprosecution not barred where jury discharged because one juror had served on grand jury indicting defendant); Wade v. Hunter, 336

U.S. 684 [69 S.Ct. 834, 93 L.Ed. 974] (1949) (retrial not barred where military court martial discharged due to tactical necessity in the field.) pp. 481–482, 91 S.Ct. 555.

The defendant argues that the situation was not one in which there was a manifest necessity for the declaring of a mistrial and that the request to strike should have been granted. However, it was obvious that the government's failure to supply the statements, although inadvertent, altered the entire conduct of the proceedings. The only real issue was that of identification and the statements in question dealt with the recollections of the identification witnesses prior to the time they were to view the lineup. The use of these statements for cross-examination and the arguments to the jury they might make possible made their importance obvious. As a matter of fact, at Clark's second trial, there was extensive cross-examination based on these statements.[6]

■■ Moreover, it is not necessary for the court to find that a defendant was prejudiced by the prosecution's failure to make available statements of this type. The mandate of the statute itself makes omission substantial: United States v. Prince, 264 F.2d 850, 852 (3rd Cir. 1959). A court should not try to guess what defense counsel might find useful for impeachment purposes in withheld documents to which the defense is entitled. See Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959). I conclude that tested by the principles of *Perez*, *Jorn*, and the Jencks Act, a mistrial was required in the interests of justice.

■ Defendant argues that declaring a mistrial was error for two additional reasons. In the first place, he maintains the Jencks Act is not applicable because there had been no demands for the statements by the defense and no court order that they be produced. However, the prosecution, defense, and the court, all knew that the defense was using statements from the government's files for cross-examination purposes. They were being furnished despite the fact that no formal order had been entered (N.T. Feb. 28, 1972, pp. 9–10). The defendant himself had been told that "he was entitled to those statements." (N. T. June 23, 1971, p. 6, pp. 18–19.) Implicit behind the government's voluntary release of statements was the compulsion that the Jencks Act provided. There is no merit to the suggestion at this stage of the proceedings that the Act be ignored.

■ Defendant's other argument is that the trial should have continued with the identification witnesses recalled for further cross-examination. This was exactly what I suggested to Clark and which he rejected. He did so against the advice of his attorney (N.T. June 23, 1971, p. 8, p. 27, p. 34), but having examined Clark thoroughly at the time (N.T. June 23, 1971, pp. 12–43), I am convinced he did not so knowingly and intelligently. Therefore, he is estopped by his own decision from now asserting this procedure should have been followed. There is no provision in the Jencks Act for split cross-examination of the type which would have resulted, and I conclude it would have been an abuse of discretion to have recalled the witnesses without first securing an informed agreement from Clark. He refused to give it. If the trial had then proceeded and if Clark was now contending there had been error which warranted a new trial, I would agree and grant it.

Clark also raised the usual formal reasons for a new trial, but did not press them at argument. Nonetheless, they were all considered and found to be without merit.

6. See N.T. Aug. 4, 1971, 110–12, 115–18, 121–22, 163–64, and 207–11.