**UNITED STATES of America**
**v.**
**Claude Lorenzo CORBITT et al.**
**Crim. No. 71–320.**

United States District Court,
E. D. Pennsylvania.
Sept. 28, 1973.

882

Robert N. DeLuca, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Joseph C. Santaguida, Philadelphia, Pa., for Corbitt.

Nino V. Tinari, Philadelphia, Pa., for Jackson.

Lynwood F. Blount, Philadelphia, Pa., for Mims.

## OPINION AND ORDER

DITTER, District Judge.

The defendants were convicted of bank robbery. Their post-trial motions raise questions of double jeopardy, jury

selection, jury contamination, and the propriety of their being identified.[1]

On February 23, 1971, the Exton Branch of the Southeast National Bank was robbed by at least six men. Just as the robbery began, two surveillance cameras were activated and, as a result, literally hundreds of pictures were taken of the men who were inside the bank. These pictures, which were introduced into the evidence, showed the various robbers in many different positions as they moved around the room, changing the camera angles on their faces and bodies. The defendants in this case, Claude Lorenzo Corbitt, Harry Mims, and Darrell Jackson, were arrested in each other's company on May 27, 1971, and first brought to trial on November 2 through 5, 1971, but the jury was unable to reach a verdict. An attempt to start the retrial on January 18, 1972, was aborted at the defendants' request because the notes of testimony from the November proceeding were not yet completed. A second trial was held on April 11 through 18, 1972. Again the jury was hopelessly deadlocked and a mistrial declared. Finally, the third jury reached a verdict of guilty as to all three on all counts after a trial on July 24 through 31, 1972.

## I. Double Jeopardy

All defendants claim that their first trial was prematurely terminated and that consequently their second and third trials violated the Fifth Amendment by placing them in double jeopardy. The prohibition in the Fifth Amendment to which they point was designed to prevent repeated prosecutions for the same offense and the concomitant imposition of a heavy drain on the defendant's resources. The defendants cite in support of their argument United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). In that case, the trial judge suddenly halted the proceedings believing his action was necessary to protect the interests of a witness whom he felt had not been given sufficient warnings as to his Constitutional rights.

In sustaining a plea of double jeopardy to an attempted second trial of the defendant, the Supreme Court emphasized the trial judge had acted so abruptly and without considering the alternatives available, that it was apparent he had made no effort to exercise sound discretion. Having failed to take all of the circumstances into account, there was no basis for his concluding a manifest necessity for the declaration of a mistrial existed.

As Judge Hunter has recently observed in United States ex rel. Gibson v. Ziegele, 479 F.2d 773 (3rd Cir. 1973) at 776, "[T]he landmark decision construing the Double Jeopardy Clause in the context of a declaration of a mistrial over a defendant's objection is United States v. Perez, 9 Wheat. (22 U.S.) 579, 6 L.Ed. 165 (1824). In that case, the Court held that a defendant could be tried a second time after the judge, over the defendant's objection, excused a jury which had reported that it could not agree upon either acquittal or conviction. In his opinion, Mr. Justice Story expressed the following thoughts about what standards should determine whether or not a defendant can be reprosecuted when his first trial ends in a mistrial without his consent:

'We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, *taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.* They are to exercise a sound discretion on the subject. . . .' Id. at 580."

In the instant case, the details show that a manifest necessity was in fact present as to both occasions when mistrials were declared.

---

1. The contentions advanced by any one of the defendants will be treated as though advanced by all.

On November 5, 1971, the jurors began their deliberations at 3:45 P.M. (N.T. Nov. 5, 1971, p. 61). At sometime early in the evening they had dinner. Just before 8:00 P.M. several questions were answered. One of them involved the definition of a "hung jury" (N.T. Nov. 5, 1971, p. 65). Finally, at approximately 10:00 P.M., the jury sent word that it was at "an impasse". Preparations had already been completed for overnight accommodations and for continuing deliberations on November 6. Counsel for the defendants objected to these plans (N.T. Nov. 5, 1971, p. 68), later making it clear they felt coerced verdicts would result.

While the arrangements were being explained to the jury, the foreman, Mr. Tufts, asked to speak with me and stated that he did not think the jury could reach a decision (N.T. Nov. 5, 1971, p. 70). It had then deliberated for more than four hours (N.T. Nov. 5, 1971, p. 74). Upon the request of defense counsel, I talked to the foreman in their presence, the presence of the defendants having been waived. After being informed that he was not to state any numerical division, Mr. Tufts said, ". . . we have been at the same point for a considerable amount of time and we have deliberated and we are still at the same point." (N.T. Nov. 5, 1971, p. 75). When it was suggested that other approaches be given consideration, he replied, "the approaches that you mentioned we have employed. And, you

know, each defendant, each witness, reaching the same impasse each time and this is why I made the statement. The decision to inform you that we had reached this impasse is one of, you know, not my decision alone but the members of the jury." (N.T. Nov. 5, 1971, p. 76). Mr. Tufts did not think further deliberation the next day would help. He also stated that they were hopelessly deadlocked and could not agree on any of the issues, counts, or defendants (N.T. Nov. 5, 1971, p. 77). The full jury confirmed his opinion (N. T. Nov. 5, 1971, p. 78). I believed the jurors and regretfully declared a mistrial.

After consultation with their clients, the defense attorneys objected to my having ended the proceedings.[2] The defendants now argue that the solution to the problem was additional instructions, such as those permitted by United States v. Fioravanti, 412 F.2d 407 (3rd Cir. 1969), cert. den. sub nom. Panaccione v. United States, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969). However, such instructions had already been given in the main body of the charge (Nov. 5, 1971, pp. 5–6)[3] and counsel did not ask that they be repeated. Rather, they urged me to declare a mistrial.

 If a jury is hopelessly deadlocked there is no chance for a verdict and a mistrial should be declared. Of course, it does not follow that every jury which seems to reach an impassable

2. After Mr. Tufts, the jury foreman, said it was hopelessly deadlocked, I talked with counsel in such a way that he could not hear what was said. The attorneys for the defendants, Corbitt and Jackson, requested the granting of a mistrial because any direction to the jury to renew deliberations would in effect be coercive. At first, counsel for the third defendant, Mims, said he wished to discuss the matter with his client, but upon consultation with the other attorneys, he agreed to make no objection to the granting of a mistrial and decided he would not consult with Mims about the matter. The jury foreman was then told a mistrial would be declared. When I returned to the court room, the attorney for Mims indicated he would object to the granting of a mistrial.

As soon as the jury had been excused, his objection was placed on the record and similar objections were made on behalf of Corbitt and Jackson (N.T. Nov. 8, 1971, p. 3 through 5). As previously mentioned, all three attorneys had objected when I told them I had obtained overnight accommodations for the jury so it could begin further deliberations the next morning (N.T. Nov. 5, 1971, p. 68). Thus the defendants objected both to the jury's being allowed to deliberate further and its not being allowed to deliberate further.

3. These instructions were taken from those suggested by the American Bar Association, Minimum Standards for Criminal Justice, Trial by Jury, § 5.4.

point in its deliberations is hopelessly deadlocked. Jurors may have moments of despair and believe no agreement is possible only to find upon further consideration the existence of a common ground on which all will concur. It is equally true that a verdict may be coerced by a judge who is anxious not to retry a long and burdensome case. The line between giving a jury sufficient time to explore all possibilities for true unanimity and a coerced verdict sometimes may be a fine one. If there is to be error, it should be on the side of avoiding a coerced verdict by the granting of a mistrial rather than by obtaining a decision through fatigue and frustration. Such matters as the complexity of issues, the number of witnesses, and the length of the trial must all be weighed. In the instant case, there were no complicated legal or factual matters —the only real question was whether the government had satisfied the jury beyond a reasonable doubt on the question of the identity of one or more of the defendants. After approximately four hours of deliberation,[4] when the foreman said the jury could not reach a verdict and the jurors all concurred, I could not see how any additional time could produce anything but an unconscionable decision.

■ The facts of the April, 1972, trial show even more strongly the justification for the granting of a mistrial. At that proceeding the jury received the case at 11:35 A.M. (N.T. p. 6–69).[5] At about 6:00 P.M. the jury reported, "We are hopelessly deadlocked. We took a poll and it comes out 11 to 1 on every defendant and every count with no chance of change." (N.T. p. 6–75). To give the jurors a chance to relax and review their problems, they were sent to dinner. Once again, around 9:30 P.M. they sent a note, "We, the jury, are still deadlocked. We cannot change our verdict. It still stands at 11 to 1." (N.T. p. 6–77). In open court, I asked the jury whether any of them felt any good purpose would be served if additional time for deliberation was afforded to them. There was no response. Stating he was acting on behalf of his client, each attorney for each defendant moved for a mistrial (N.T. p. 6–77–8). Based on the length of time the jury had been considering the matter, the nature of the case, the notes from the jury, and the motions made by counsel, I was satisfied that manifest necessity for a mistrial existed. It is the granting of their own motions which is now assigned by the defendants as error. They do not argue that the jury was not hopelessly deadlocked. Rather they contend that it was error to retry them since there had been no expressed or implied acquiescence on their part to my declaring a mistrial and no absolute necessity to do so.[6] In view of the contradiction between their positions and the record, these assertions are frivolous.

As additional support for their contention that the second and third trials were illegal, defendants cite two state cases, Commonwealth v. Baker, 413 Pa. 105, 196 A.2d 382 (1964), and Commonwealth v. Lauria, 450 Pa. 72, 297 A.2d 906 (1972). Neither is applicable here. The former dealt with the limiting effect of Pennsylvania's Constitution on retrials for first degree murder, while the latter involves a Pennsylvania Rule of Criminal Procedure.

■ Manifest necessity for the grant of both mistrials having existed, there was no bar to the defendants' third trial.

---

4. The jurors began their deliberation at 3:45 P.M. At approximately 6:30 P.M. they went to dinner and returned to the court room at approximately 8:00 P.M. for further instructions. At approximately 10:15 P.M. the jury returned to the court room and the conversation with Mr. Tufts, the jury foreman, then took place.

5. The pages of the April transcript are the only ones numbered by volume and page. Volume 6 records the events of April 18, 1972, the sixth day of the trial.

6. See brief submitted on behalf of Claude Lorenzo Corbitt, Document 119, p. 4.

## II. Racial Composition of Jury

The defendants, who are all Negroes, objected to the array and to the prosecutor's use of peremptory challenges on the grounds that they were tried by a jury of whites.

First, the defendants claim that because only twelve Negroes were present in the group of 114 individuals from whom their jury panel was drawn, Negroes are discriminated against and kept from jury duty. Specifically, they object to the fact that jurors are drawn from the entire district, including areas where few non-whites live (N.T. July 24, 1972, p. 3). They assert that 50 per cent of Philadelphia's population is black (N.T. July 24, 1972, pp. 3 and 4). Therefore, their attorneys argue that the defendants were denied a jury of their peers, citing Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) and Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939).

■ These arguments have no merit. The defendants did not really challenge the procedure by which jurors are selected.[7] The real heart of their position is that the percentage of Negroes to whites available to be called for their particular jury was not as high as the percentage of Negroes to whites in Philadelphia's population. Initially, of course, this argument overlooks the fact that there may have been many additional Negroes on the panel who were serving on other trials at the time the jury in the instant case was called.

Although a defendant in a criminal trial is entitled to a jury selected from a master list reflecting a broad spectrum of society, it is not constitutionally required that he be tried by a jury including persons of his race or economic class, or by a jury numerically representative of his community: United States v. Dorsey, 462 F.2d 361 (3d Cir. 1972) citing Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). On the contrary, the requirement is that the government not purposely or systematically discriminate on racial grounds in the jury selection process.

■■ Moreover, purposeful discrimination may not be assumed or merely asserted. It must be proven. Proportional representation is not assured. Even if the system does not produce equal representation from each identifiable community group, it does not prove there has been discrimination: Swain v. Alabama, supra. The defendants have only made accusations. They have offered no proof to support any possible prohibited bias in the selection process or intent to exclude members of the Negro race.

The motion challenging the array was properly overruled.

■ The defendants' other attack on the jury by which they were tried arises from the prosecutor's striking peremptorily all five Negro members of the panel. Defendants claim that his doing so denied them a fair trial and a jury of their peers.

■ Rule 24(b) of the Federal Rules of Criminal Procedure allows the government six peremptory challenges in cases of this type. As Swain v. Alabama, supra, makes abundantly clear, the thought processes of the prosecutor in deciding how he will exercise these challenges is beyond the Court's inquiry, and the resulting composition of the jury in a particular case does not establish impropriety.

In *Swain*, at 380 U.S. 220–222, 85 S.Ct. 836–837, the Court said,

The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without

---

7. In the Eastern District of Pennsylvania, jurors are chosen for the panel under the provisions of a plan required by the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861. The jurors' names are selected at random from voters lists for the ten counties constituting the Eastern District. The propriety of a similar plan is discussed in United States v. Lewis. 472 F.2d 252 (3d Cir. 1973).

inquiry and without being subject to the court's control. . . . [T]he peremptory [challenge] permits rejection for a real or imagined partiality. . . . [T]he question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be. . . . Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried.

With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto,* would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned.

In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. Hence the motion to strike the trial jury was properly denied in this case.

The Fifth Circuit has recently pointed out that *Swain,* also said the Constitution may prohibit the regular use of peremptory challenges as an effective means to disenfranchise a particular class of persons from jury service or to prevent their participating in the administration of criminal justice: United States v. Pearson, 448 F.2d 1207, 1214–1215 (5th Cir. 1971), citing 380 U.S. at 223, 85 S.Ct. at 837.

"*Swain* teaches that the State cannot deprive a class of persons of the privilege of serving on juries by 'perverted' use of peremptory challenges, although a particular defendant does not have an Equal Protection right to be tried by jurors of any particular race." United States v. Carlton, 456 F.2d 207, 208 (5th Cir. 1972).

*Pearson* held that the striking of all Negroes in a single case did not show discriminatory practices (448 F.2d at 1213–1214), nor would the record of strikes for an entire week establish systematic exclusion. The burden of proof in such cases is a heavy one.

The rule that an exercise of peremptory challenges which results in the absence of Negroes in a particular case does not prove impropriety is followed in other Circuits: Hall v. United States, 83 U.S.App.D.C. 166, 168 F.2d 161 (1948), cert. den. 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775, reh. den. 335 U.S. 839, 69 S.Ct. 9, 93 L.Ed. 391 (1948); United States ex rel. Dukes v. Sain, 297 F.2d 799 (7th Cir. 1962); Maxwell v. Stephens, 348 F.2d 325 (8th Cir. 1965), cert. den., 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353, reh. den. 382 U.S. 1000, 86

S.Ct. 532, 15 L.Ed.2d 490 (1965); Brown v. Crouse, 425 F.2d 305 (10th Cir. 1970). See also, Annot. 4 ALR2d 1200 (1949), 11 ALR Fed 713.

### III. Jury Contamination

During the noon recess on the second day of the trial, juror No. 6, Joseph Cutri, had a casual conversation with Police Officer Edward Gaughan, who was a prospective witness. The gist of the discussion was related to the court as follows:

> Officer Gaughn [8] told me he had been standing out in the hall and a man came up to him whom he had known; a family acquaintance of considerably long standing. This man said to him, what are you here for?
>
> Officer Gaughn said I am here on a case which is being tried. The man said to him, which one, and Officer Gaughn either indicated this room or in front of me. The gentleman said to him, well, why are you here, and Officer Gaughn said, well, I arrested the defendants or the man or some reference. Then the man said to him, well, I thought this crime was committed or was supposed to have been committed in Exton or words to that effect. Officer Gaughn said, I arrested him [sic] in Philadelphia. Officer Gaughn said, what are you doing here, and the man said, I am on that jury in that case. Immediately Officer Gaughn as I recall said no more and the man said no more, and that was the end of the conversation. The man in question was Juror No. 6, Mr. Cutri. (N.T. July 25, 1972, p. 102).

■ The defendants moved for a mistrial because the communication was prejudicial, the juror had sought out a police officer, and because the juror had not indicated that he knew a policeman.[9]

The court gave defense counsel a chance to question the officer and the juror and offered to substitute one of the alternates. All options were refused (N.T. July 25, 1972, pp. 105–06).

The two men were only casual acquaintances and the juror did not know that the officer was to be a witness.[10] The matter had not been discussed with the rest of the jury (N.T. July 25, 1972, pp. 110–111). Clearly, the conversation was not premised on any improper motive. It is also apparent that a mistrial would not have been warranted under the standards of United States v. Jorn, supra. See generally United States v. Walden, 448 F.2d 925 (4th Cir. 1971), modified 458 F.2d 36 (4th Cir. 1972). The most extreme remedy here would have been the seating of an alternate.

■ Moreover, the contact between juror and witness was casual and harmless. There is a rebuttable presumption that communications between a juror and a witness are prejudicial, but there was no prejudice here. The identity of the arresting officer and the fact of arrest were not at issue. In addition, the entire jury heard the same uncontradicted information from Officer Gaughan when he later testified (N.T. July 27, 1972, pp. 178–180). Any presumption of prejudice was overcome by the facts. See Tillman v. United States, 406 F.2d 930, 936 (5th Cir) vacated in part on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969); Little v. United States, 331 F.2d 287, 294–295 (8th Cir. 1964); Johnson v. United States, 207 F.2d 314, 322–323 (5th Cir. 1953); and United States v. Flynn, 216 F.2d 354, 367–372 (2nd Cir. 1954).

### IV. Line-Up

■ Counsel for Jackson, and impliedly, the attorneys for the other two

---

8. The officer's last name is misspelled in the July 25, 1972, transcript. The correct spelling, Gaughan, appears in the July 27, 1972 volume.

9. The jury had not been told the names of prospective witnesses during voir dire. (N.T. July 25, 1972, p. 104)..

10. Mr. Cutri testified that "I never see him. I was surprised to see him and that's why I asked him what he was doing him [sic]. I never knew he became a cop." (N.T. July 25, 1972, p. 110).

defendants, argues in his post-trial brief that the in-court identifications were tainted by improper line-ups in June 1971.[11] However, the defendants made no pre-trial motion to suppress and no objection relating to suggestive line-ups was asserted at trial. Now, general claims of prejudice are raised because "the defendant was the only member of the line-up who even vaguely resembled the armed robber involved in the crime." (Post-trial brief for Darrell Jackson, p. 11).

There is absolutely no basis for this argument. The record shows that the witnesses' attention was not directed to any individual by dress, weight, height, appearance, or complexion.[12] At the line-up, Jackson was identified by Mrs. Eileen Eidam, a teller during the robbery, as possibly one of the men (N.T. July 25, 1972, p. 13 and July 27, 1972, p. 173). Corbitt was identified by Mrs. Eidam and Mrs. Eleanor Stratton, manager of the robbed bank (N.T. July 25, 1972, pp. 11–12, and 184). No other identifications were made at the show-ups: Mims was not then identified.[13] He was forced to participate shackled between two other men. He held his head in such a fashion that no one got a clear view. Five or more similarly shackled individuals were also paraded. In short, if any undue interest was focused on any defendant it would have been on Mims and caused by his own conduct.

The defendants obviously elected as a matter of strategy to try to rebut the in-court identifications of all three defendants with the events of the line-up.

Now that they have been convicted, their general accusations of prejudice are not sufficient to overcome evidence they chose to allow in without objection. See United States v. McQueen, 458 F.2d 1049, 1051 (3rd Cir. 1972). As the record amply demonstrates, the line-ups were properly conducted within the guidelines furnished by United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).[14]

## V. The Charge

The defendants make only one claim with regard to my jury charge. They contend the instructions on eyewitness identification were improper. Specifically they object to one sentence: "It is not even essential that a witness himself be free from doubt as to his or her belief."

This portion of the charge concerning identification covered five pages of the transcript (N.T. July 31, 1972, pp. 33–37). The sentence attacked, which was specifically approved in United States v. Barber, 442 F.2d 517, 528 (3rd Cir. 1971), cert. denied, 404 U.S. 958, 92 S. Ct. 327, 30 L.Ed.2d 275 (1971), appears on the bottom of page 34 immediately following a discussion of the factors that may weaken an identification and before detailed instructions on the jury's duty to weigh the correctness and credibility of the testimony. Thereafter, the charge covered the obligation to apply the reasonable doubt burden of proof when determining the identity of the robbers. These instructions followed

11. The April line-up (actually held in March 1971) referred to in the record involved a fourth participant in the robbery. See United States v. Clark, 346 F.Supp. 428 (E.D. Pa.1972), affirmed by judgment order, 475 F.2d 1396 (3rd Cir. 1973).

12. See N.T. July 25, 1972, pp. 8–13, 148–149, and July 26, 1972, pp. 73–74, 141–143, and 153–156.

13. See N.T. July 25, 1972, pp. 10, 48, 183, 184, and July 27, 1972, pp. 72, 116–117, 143, and 155–160.

14. No claim was directly raised concerning the various photographic spreads shown to various witnesses. If one had been raised it could not be sustained. See Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 380–383, 34 L. Ed.2d 401 (1972) and United States v. Bostic, 360 F.Supp. 1300, at pp. 1303–1305 (E. D.Pa.1973) and cases cited therein, on this point and out of court identifications generally.

the guidelines provided by *Barber* and the sentence in question was appropriately placed.

### VI. Judgment of Acquittal

At the conclusion of the evidence each defense attorney moved for a directed verdict of acquittal (N.T. July 27, 1972, pp. 185–193). There was overwhelming evidence that a crime had been committed, hundreds of pictures identifying the robbers, and the testimony of the bank employees. The case was for the jury and the motions were properly denied.

The defendants have also raised the usual grounds for acquittal or a new trial. They make non-specific attacks on the sufficiency of the evidence and the rulings of law. They also lodged general objections to the charge. After a thorough review of the record, these routine allegations are found to be without merit. Accordingly all post-trial motions will be denied.